FRATERNAL ORDER OF POLICE, LODGE NO. 5, Robert S. Hurst, individually as resident and taxpayer of the City of Philadelphia and in his capacity as President of Fraternal Order of Police, Lodge No. 5, John Doe, Police Officer, individually and in his capacity as a uniformed, sworn Civil Service Employee of the Philadelphia Police Department assigned to the Major Investigations Division, Ethics and Accountability Division and International Affairs Division of the Philadelphia Police Department, Jane Doe, individually as the spouse of Police Officer, John Doe

v.

CITY OF PHILADELPHIA, Kevin M. Tucker, individually and in his capacity as Police Commissioner Philadelphia Police Department, Robert Mitchell, individually and in his capacity as Police Inspector and Commander, Special Investigations Bureau Philadelphia Police Department, and Edward McLaughlin, individually and in his capacity as Police Inspector and Commander, Internal Affairs Division Philadelphia Police Department.

Appeal of CITY OF PHILADELPHIA, Kevin M. Tucker, Robert Mitchell and Edward McLaughlin, Appellants.

No. 86–1407.

United States Court of Appeals,
Third Circuit.

Argued Nov. 4, 1986.
Decided Feb. 17, 1987.

Ralph J. Teti (argued), Maureen E. Laflin, City of Philadelphia, Law Dept., Philadelphia, Pa., for appellant.

Anthony J. Molloy, Jr. (argued), Robert B. Mozenter, Michael S. Durst, Mozenter, Molloy & Durst, Philadelphia, Pa., for appellee.

* Hon. Joseph J. Farnan, United States District Court, District of Delaware, sitting by designa-

James D. Crawford, Steven J. Fram, of counsel, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for amicus curiae American Civil Liberties Union of Pa.

Before SLOVITER, STAPLETON, Circuit Judges, and FARNAN, District Judge *

### OPINION OF THE COURT

SLOVITER, Circuit Judge.

## I.

### Issue

The Fraternal Order of Police (FOP) has raised constitutional challenges to a questionnaire promulgated by the Philadelphia Police Department for use in selecting applicants to its Special Investigations Unit (SIU). The district court held that portions of the questionnaire seeking information concerning applicants' medical history, gambling habits and alcohol consumption, and seeking information about applicants' and their families' financial status, organizational memberships, and arrest records violate police officers' federal constitutional rights of privacy and association. The court enjoined the City of Philadelphia from including these items in the questionnaire. The City appeals. Because there are no relevant disputed questions of fact, and the decision hinges on application of constitutional principles, our review is plenary. *See Cole v. Flick,* 758 F.2d 124, 130 (3d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 253, 88 L.Ed.2d 260 (1985).

## II.

### Facts

On January 31, 1986, Philadelphia Police Commissioner, Kevin M. Tucker, who was appointed at the beginning of that month, sent all police personnel a teletype announcing the formation of a Special Investigations Unit and advising police personnel interested in volunteering for the unit to

tion.

contact the Deputy Commissioner. The teletype stated that applicants would be required to submit to a polygraph examination and personal interview before acceptance. App. at 34. Shortly thereafter, the Police Department prepared a document, referred to as the Fact Sheet, containing the procedures and questions to be used in the SIU application process.

The Fact Sheet states that SIU applicants must complete and certify a questionnaire, attached thereto, and must undergo an initial personal interview, a background investigation, a polygraph examination, and a final personal interview. The questionnaire contains thirty-nine questions seeking personal information about the applicant and his or her family. The Fact Sheet states:

> All answers to this Questionnaire are considered confidential and will not be disclosed to any agency or unauthorized person, nor will they be made part of any departmental record or used against you in any manner in your future career with the department.

App. at 536. In addition, the Fact Sheet informs applicants that they may withdraw from the application process at will with no effect on their "future career in the Department," and that upon withdrawal, their "questionnaire, and all other related paperwork will be destroyed." App. at 534.

The Fraternal Order of Police, the bargaining representative of Philadelphia police personnel, responded to the teletype by filing a grievance with respect to the required polygraph examination. Subsequently, the FOP also filed a complaint in Philadelphia Common Pleas Court seeking an injunction barring use of the polygraph pending arbitration of the grievance. Following the hearings thereon, the City of Philadelphia and the Philadelphia Police Department agreed to refrain from implementing the polygraph requirement pending an expedited arbitration of the polygraph issue, and the FOP withdrew its request for a preliminary injunction in state court.

Immediately thereafter, the FOP, its president, Robert S. Hurst, and two un-named individuals filed a complaint in federal district court pursuant to 42 U.S.C. § 1983 challenging, *inter alia*, certain questions contained in the questionnaire, as well as the polygraph examination, as violative of the police officers' federal constitutional rights of privacy and due process under the Fourth, Fifth, and Fourteenth Amendments and of their right to privacy under the Pennsylvania Constitution. The FOP sought declaratory and injunctive relief.

The district court conducted three days of evidentiary hearings on the FOP's request for a preliminary injunction. The City relied primarily on the testimony of Commissioner Tucker to justify the questionnaire. Tucker explained that the SIU would serve to exercise centralized control over internal corruption investigations, internal disciplinary investigations and vice investigations, which are currently the responsibility of three divisions: "the Ethics Accountability, Major Intelligence, and Internal Affairs divisions. Tucker believed a centralized unit was needed because of the large numbers of indictments and convictions of Philadelphia police officers, among them high level officers including a deputy commissioner, for corruption. Because the majority of corruption existed in the area of vice and narcotics, he sought "to centralize those units in one organization so there will no longer be fragmentation; there will no longer be vice people working out in districts uncoordinated; a tighter span of control and supervision in a central function." App. at 436. He believed it was necessary to put vice and narcotics officers through a stringent screening selection process, App. at 439, and justified the information sought by the questionnaire as necessary for the selection of officers best suited "for a sensitive unit that's going to be investigating corruption, conduct, vice, narcotics, the things that are very important if we are going to bring integrity back to this City and this police department." App. at 441.

Following the completion of testimony, the district court, pursuant to Fed.R.Civ.P. 65(a)(2) and with the agreement of the par-

ties, consolidated the proceedings on the preliminary injunction with the proceedings on the merits for a final injunction. In ruling, the court divided the questions challenged by the FOP into four distinct groups: (1) those dealing with physical and mental condition, (2) those dealing with behavior, (3) those requiring financial disclosure; and (4) one requiring disclosure of offices and directorships. The court concluded that the information sought by the first three groups of questions was entitled to some privacy protection.

In its opinion, the court expressed its concern about (1) "[t]he lack of adequate safeguards to prevent the subsequent nonconsensual disclosure of the applicant's responses to the public or to other members of the police department"; (2) what it believed was "the lack of specificity of the questions"; and (3) what it termed "Police Commissioner Tucker's inability to clearly explain what may result if it is believed that an applicant provided an inaccurate response to a question." App. at 791–92. The court concluded that the questions at issue violate applicants' federal and Pennsylvania rights of privacy because there was "no evidence in the record that any formal policy has been adopted by the police commissioner concerning the dissemination of the questionnaire information," because the record demonstrated that applicants might be subject to "unknown dangers" from having "private information divulged to persons who [they] never expected would be privy to the information," and because the questions "needlessly include within their scope private information which is not relevant to achieving an honest and efficient police force." App. at 792–93.

The court did not analyze whether the question regarding offices and director-

ships implicated a right to privacy. Rather, the court concluded that the question violated the applicants' First Amendment right of free association.

The court permanently enjoined the police from requiring SIU applicants to answer all twelve of the challenged questions.[1] The court retained jurisdiction over the FOP's challenge to the polygraph requirement pending the result of the arbitration on that issue. The City appeals. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).[2]

### III.

### *Right to Privacy*

### A.

### *Level of Scrutiny*

It is now established that the United States Constitution provides some protection of an individual's privacy. *See Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 876–77, 51 L.Ed.2d 64 (1977); *United States v. Westinghouse Electric Corp.,* 638 F.2d 570, 577 (3d Cir.1980). This constitutional right of privacy extends to two types of interests:

> "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen v. Roe,* 429 U.S. 589, 599–600 [97 S.Ct. 869, 876–77, 51 L.Ed.2d 64] (1977) (footnotes omitted). The latter decisions have encompassed "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education." *Paul v. Davis,* 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976).

---

1. The court also dismissed the complaints of Hurst and the unnamed individuals for lack of standing and dismissed as unripe the FOP's challenge to proposed but not yet promulgated Civil Service Regulations which would authorize use of the SIU application process for appointment, assignment, transfer, promotion, and reinstatement of all police personnel. These orders are not before us.

2. The injunction is appealable under 28 U.S.C. § 1292(a)(1) even though the FOP's challenge to the polygraph remains pending. The injunction granted by the court may have serious consequences to the City that can be effectively challenged only by immediate appeal, the essence of the basis for permitting immediate appeal of interlocutory injunctions. *See Presinzano v. Hoffman-La Roche, Inc.,* 726 F.2d 105, 109 (3d Cir.1984).

*Id.* The Supreme Court of Pennsylvania has adopted the same two-pronged analysis of privacy for cases arising under that state's constitution. *See Denoncourt v. Commonwealth of Pennsylvania State Ethics Comm'n,* 504 Pa. 191, 197–98, 470 A.2d 945, 948 (1983); *In re June 1979 Allegheny County Investigating Grand Jury,* 490 Pa. 143, 150–51, 415 A.2d 73, 77 (1980). It is the constitutional protection against disclosure of personal matters that is at issue here.

█ We have previously explained that there is no absolute protection against disclosure. Disclosure may be required if the government interest in disclosure outweighs the individual's privacy interest. *Trade Waste Management Ass'n, Inc. v. Hughey,* 780 F.2d 221, 234 (3d Cir.1985); *Westinghouse,* 638 F.2d at 577.

In addressing claimed violations of confidentiality interests, the Supreme Court has applied a flexible balancing approach. For example, in *Nixon v. Administrator of General Services,* 433 U.S. 425, 458, 97 S.Ct. 2777, 2797, 53 L.Ed.2d 867 (1977), the Court stated: "But the merit of appellant's claim of invasion of his privacy ... must be considered in light of the specific provisions of the Act, and any intrusion must be weighed against the public interest in subjecting the Presidential materials of appellant's administration to archival screening." Most circuits appear to apply an "intermediate standard of review" for the majority of confidentiality violations, *see Barry v. City of New York,* 712 F.2d 1554, 1559 (2d Cir.), *cert. denied,* 464 U.S. 1017, 104 S.Ct. 548, 78 L.Ed.2d 723 (1983), with a compelling interest analysis reserved for "severe intrusions" on confidentiality. *See Thorne v. City of El Segundo,* 726 F.2d 459, 469 (9th Cir.1983), *cert. denied,* 469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984); *see also Whalen,* 429 U.S. at 606–07, 97 S.Ct. at 879–80, (Brennan, J., concurring) ("a statute that did effect such a [serious] deprivation [of privacy] would only be consistent with the Constitution if it were necessary to promote a compelling state interest"). *But see Mangels v. Pena,* 789 F.2d 836, 839 (10th Cir.1986) (compelling interest analysis for all privacy violations).

In *Westinghouse,* this court set out the general balancing test as follows:

[W]e must engage in the delicate task of weighing competing interests. The factors which should be considered in deciding whether an intrusion into an individual's privacy is justified are the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

638 F.2d at 578.

The district court suggested that a test more stringent than this balancing standard should be applied. It read *Denoncourt v. Commonwealth of Pennsylvania State Ethics Comm'n,* 504 Pa. 191, 470 A.2d 945 (1983), as requiring a least restrictive means analysis for privacy violations under the Pennsylvania Constitution. Although it is not clear which test the district court actually applied, it would have been error not to apply the *Westinghouse* standard.

In *Denoncourt,* the Pennsylvania Supreme Court invalidated the provisions of Pennsylvania's Ethics Act which required all public officials to provide financial disclosure with respect to their family members. A majority of the court held that these provisions were violative of due process. A plurality relied as well on the right to privacy. In the privacy portion of the opinion, the plurality looked to the significance of the government interest and whether "there is [an] alternate reasonable method of lesser intrusiveness to accomplish the governmental purpose." *Id.* at 949. The plurality concluded that as applied to family members the Act was both ineffective and overbroad.

Unlike the district court, we do not read *Denoncourt* as indicating that the Pennsylvania Supreme Court would apply a standard materially different from that applied by the federal courts in examining the constitutionality of disclosures of confidential information. In the first place, we note that the privacy analysis of the plurality in *Denoncourt* commanded only three of the seven justices. One justice relied only on the due process ground and did not join in the analysis of the privacy interest. *Id.* at 950 (Roberts, C.J.). Another justice, while concurring in the result as to spouses only, explicitly dissociated himself from what he considered "the majority's unnecessary discussion of the shadowy reaches of the right of privacy the judiciary has interpolated into our state and federal constitutions." 470 A.2d at 950 (Hutchinson, J., concurring and dissenting). Two other justices dissented because, although they agreed that a right of privacy existed, they believed that the appropriate analysis was "the balancing test and the rational relationship test" under which the challenged statute would stand. 470 A.2d at 951 (Nix, J., dissenting). Thus, there is no indication that a majority of the Pennsylvania Supreme Court would apply a least restrictive means analysis to all claimed violations of the confidentiality interest.

In the second place, nothing in *Denoncourt* derogates from that court's opinion in *Snider v. Thornburgh*, 496 Pa. 159, 170–72, 436 A.2d 593, 598–99 (1981), just two years earlier, where it upheld the Ethics Act as it applied to office holders themselves against a privacy challenge. In that case, the Court applied a balancing standard similar to the federal one, looking to the level of intrusion ("not great") and the nature of the legislature's interest ("not small"). *Id.* at 599.

Finally, the *Denoncourt* decision must be viewed in light of the Pennsylvania statute at issue which expressly provided that the financial information disclosed, includ-ing that of family members, must be available for public inspection and copying. Pa. Stat.Ann. tit. 65, § 404(f). As we noted above, the federal courts also apply stricter scrutiny when there is unguarded public disclosure of confidential information.

■ Thus, we conclude that Pennsylvania courts are unlikely to subject the privacy interest in confidential information protected by the Pennsylvania constitution to scrutiny substantially different from that applied by the federal courts in analyzing the similar interest protected by the United States Constitution. We will therefore proceed to apply the flexible balancing test used in *Westinghouse* to the questions at issue, under the assumption that federal constitutional law does not differ materially in this regard from Pennsylvania constitutional law.[3]

### B.

### *Waiver*

As a preliminary matter, we must consider whether the voluntary nature of the SIU application process forecloses any privacy claim. The City suggests that the SIU applicants, as volunteers, have "elected to disclose information about themselves," Appellants' Brief at 17, and appears to argue that they have therefore waived their privacy rights.

■ We believe it is illusory to treat all SIU applicants as volunteers. Commissioner Tucker testified that current members of the three divisions being phased out would be required to comply with the SIU application procedures to retain equivalent positions in the SIU. Failure to comply would result in a return to normal duty which could subject some of these officers, for example those who investigated misconduct by other police personnel, to reprisals. App. at 234. Tests applied as a prerequisite for continued employment are hardly to be considered voluntary. *See, e.g., Ca-*

---

**3.** We reject the City's unexplained statement that Pennsylvania law is "completely irrelevant to this case." Appellants' Brief at 27. The district court had discretion to decide the FOP's pendent claim alleging violation of the Pennsyl-vania Constitution, particularly since the issues under both constitutions are closely related and no case challenging the questionnaire is pending in a Pennsylvania court.

*pua v. City of Plainfield,* 643 F.Supp. 1507, 1511 (D.N.J.1986).

█ Moreover, we reject the suggestion that the government can condition its selection of new employees on the applicants' waiver of their constitutional rights. In the First Amendment context, the Supreme Court has repeatedly stated that generally "a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). When a condition of employment impinges on First Amendment interests, the Court has undertaken to balance the employee and state interests. *Id.; United States Civil Service Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 564, 93 S.Ct. 2880, 2889, 37 L.Ed.2d 796 (1973); *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Inquiry into potentially unconstitutional conditions cannot be avoided on the ground that the employees waived their constitutional rights by applying for employment, because that would eviscerate the Court's opinions establishing a balancing standard. This is equally as applicable to employees' privacy rights as to their First Amendment rights.[4]

Thus, we hold that although the nature of the employment, and perforce the officers' free choice to join the unit, are elements to be considered in the balancing appropriate to the alleged privacy violation, we do not regard the voluntary nature of the application, even by those who are not currently employed in similar units, as a basis to pretermit analysis of whether the condition of employment violates the applicants' privacy rights.

## C.

### *The Balancing Inquiry*

Turning then to the merits of the FOP's privacy challenge, we focus first on the central holding of the district court, its conclusion that "under both the Pennsylvania and federal Constitutions, the intrusion into the applicant's privacy is not justified by the degree to which information from the questionnaire will further the state's interest in an honest and efficient police force." App. at 791. To determine whether this conclusion can be sustained, we must examine the nature of the intrusion into the officer's privacy and the state's need for the information. For this purpose, the challenged questions fall into three groups.

### 1. *Medical Information*

Three questions deal with the applicant's physical and mental condition. They ask:

18. List any physical defects or disability, also list any extended time spent in the hospital for *any* reason.

19. Are you presently using any prescription drugs? If yes, state the drug, the need for it and the dosage.

20. Are you now or have you ever been attended, treated or observed by any doctor or psychiatrist or at any Hospital or Mental Institution on an in-patient or out-patient basis for any mental or psychiatric condition? If yes, give the dates and the nature of the treatment.

App. at 539 (emphasis in original).

The district court held that because "[t]he information derived from questions 18, 19, and 20 may contain intimate facts about one's body and state of health," it is information entitled to protection under this court's decision in *Westinghouse.* App. at 788.

In determining whether information is entitled to privacy protection, we have looked at whether it is within an individual's reasonable expectations of confidentiality. The more intimate or personal the information, the more justified is the expectation that it will not be subject to public

---

**4.** A similar analysis has been applied in the Fourth Amendment context. *See, e.g., McDonell v. Hunter,* 612 F.Supp. 1122, 1131 (S.D.Iowa 1985) ("Public employees cannot be bound by unreasonable conditions of employment…. Advance consent to future *unreasonable* searches is not a reasonable condition of employment") (emphasis in original). *See also National Treasury Employees Union v. Raab,* 649 F.Supp. 380 (E.D.La.1986).

scrutiny. *See Westinghouse*, 638 F.2d at 577 & n. 5. Applying this approach, we have repeatedly held that medical information such as that sought by questions 18, 19 and 20 is entitled to privacy protection against disclosure. *Id.; In Re: Search Warrant (Sealed)*, 810 F.2d 67 (3d Cir. 1987); *Shoemaker v. Handel*, 795 F.2d 1136, 1144 (3d Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986); *Trade Waste*, 780 F.2d at 234; *see also Whalen*, 429 U.S. at 599–600, 97 S.Ct. at 876–77. In fact, medical information may be accorded special treatment under various rules and statutes in recognition of its confidential character. *See, e.g.*, Fed.R. Civ.P. 35 (higher burden for discovery of medical information than for discovery generally); Freedom of Information Act, 5 U.S.C. § 552(b)(6) (exemption of medical files).

A decision that the personal medical information sought by questions 18, 19 and 20 is entitled to privacy protection merely begins the analysis. We must next examine the strength of the government's interest in disclosure. For example, the governmental interest in public health has justified requiring disclosure of information about past medical history, present illness, or the fact of treatment. Thus, in *Whalen*, the Court referred to statutory reporting requirements relating to venereal disease, child abuse, injuries caused by deadly weapons and certification of fetal death. 429 U.S. at 602 n. 29, 97 S.Ct. at 878 n. 29. Similarly, in *Westinghouse*, we held that an employer must disclose employee medical information to NIOSH in the interest of employee occupational safety and health. 638 F.2d at 579.

In this case, Police Commissioner Tucker testified that the medical information sought is necessary to determine the officers' "fitness for the specific positions" within the SIU. App. at 145. The Commissioner explained that SIU members would be subject to stress and would be required at times to work long hours at consistently high levels of mental alertness. App. at 145–46. The Commissioner believed prescription drug use to be relevant to selection for SIU positions because "[t]here are specific drugs that if an individual is using over a period of time would affect their mental alertness." App. at 146. He considered mental condition to be relevant because "[i]nvestigating other police officers and corruption is a very stressful, very dynamic situation, and I wanted to make sure that we were not putting people who had any mental disability under an extreme amount of stress that would be counterproductive to them and to the organization." App. at 149. Physical condition was inquired into to insure ability to handle stress and long hours. App. at 145.

The FOP does not suggest that these articulated interests are not sincere or legitimate. It suggests only that some of the questions sweep too broadly, eliciting information that is not relevant. The district court also focused on the "needless" inclusion of irrelevant information, such as "medical information concerning an applicant's bout with a sexually transmitted disease" and "psychiatric information concerning past problems which have been resolved." App. at 793. We are not as convinced as is the district court that such information is irrelevant for selection of police officers to an investigating unit such as the SIU. Nonetheless, we recognize that some information disclosed in response to the questionnaire may have no pertinence to selection of an honest and efficient police officer.

It is not evident, however, that the City could draw the line more precisely even were it required to. No matter where the line is drawn, some information of marginal or little relevance will necessarily be elicited. Requiring a narrower line drawing might foreclose acquisition of highly relevant information. For example, the majority of childhood hospitalizations may be only marginally relevant, but to eliminate inquiry into childhood hospitalizations might mean that the City would never learn of a childhood hospitalization for rheumatic fever, a fact which might be highly relevant to the SIU applicant's stamina. In the main, the questions asked are directly to the point. Given the relevant standard of scrutiny, we do not find the FOP's overbreadth argument persuasive.

■ Moreover, the type of medical information requested has customarily been

supplied as part of the application process by all applicants to the police department. Some of these questions are identical to those in the personal data questionnaire required of all applicants. See App. at 526–27. When employees are aware that disclosure of otherwise confidential information has historically been required by those in similar positions, their expectation of privacy in that type of information is reduced. In *Shoemaker v. Handel*, 795 F.2d 1136 (3d Cir.1986), we upheld random post-race drug testing of jockeys against a Fourth Amendment challenge because, *inter alia*, the Racing Commission "historically has exercised its rulemaking authority in ways that have reduced the justifiable privacy expectations of persons engaged in the horse-racing industry," and because "[w]hen jockeys chose to become involved in this pervasively-regulated business and accepted a state license, they did so with the knowledge that the Commission would exercise its authority." *Id.* at 1142.

█ Because the medical information requested is directly related to the interest of the police department in selecting officers who are physically and mentally capable of working in dangerous and highly stressfull positions, sometimes over long periods of time, and because police officers have little reasonable expectation that such medical information will not be requested, we hold that questions 18, 19 and 20 do not unconstitutionally impinge upon the applicants' privacy interests.[5]

### 2. *Financial Information*

A second group of questions seeks financial information. Questions 25 through 29 ask the following about applicants and their immediate families:

25. List each loan or debt over $1,000. a) Mortgage/rent b) Car loans c) Alimony/Child Support d) Other.

26. Salary, wages and Fees: List all sources of income in the form of salary, wages, fees and other compensation for services received by you, your spouse, or your minor dependent children during 1985 including your Departmental salary.

27. Income from Property, Business, Partnership, or Other Entity: List sources from which $500 or more was received by you, your spouse, or your minor dependent children during 1985 including all securities, mutual fund income, Trust income and Business income.

28. Property or Investments: List all properties and investments you own and gains which equal or exceed both $500 and 5% of the purchase price, received by you, your spouse, or your minor dependent children during 1985. If none, write "none".

29. Gifts and Honoraria: Do Not list gifts exchanged among certain family members. Do List all other sources of $100 or more (in the aggregate during 1985) in gifts or honoraria received by you, your spouse, or your minor dependent children. Gifts include transactions in which you received at least $100 more in money or property value compared to what you paid or exchanged.

App. at 541–42.

The district court believed that these questions sought information entitled to

---

5. The American Civil Liberties Union, in its amicus curiae brief, suggests that some of the questions might elicit information, such as taking of birth control pills, which would have an impact on the other prong of privacy, that dealing with autonomy in certain types of personal decisions. Amicus Brief at 8. If an officer's exercise of rights protected by the autonomy interest might be deterred, a more stringent scrutiny would be appropriate. See *Thornburgh v. American College of Obstetricians*, —— U.S. ——, 106 S.Ct. 2169, 2192, 90 L.Ed.2d 779 (1986). However, the record is devoid of any evidence suggesting that certain questions would have a chilling effect. See *Planned Parenthood of Missouri v.*

*Danforth*, 428 U.S. 52, 79–81, 96 S.Ct. 2831, 2845–46, 49 L.Ed.2d 788 (1976) (upholding limited disclosure of abortion records to public health officials absent "legally significant impact or consequence on the abortion decision"); *Buckley v. Valeo*, 424 U.S. 1, 69–72, 96 S.Ct. 612, 658–59, 46 L.Ed.2d 659 (1976) (upholding financial disclosure requirements because challengers had not "tendered record evidence" of "serious infringement on First Amendment rights"). Therefore, assuming that there will be adequate protection against unauthorized disclosure, *see* text at p. 118 *infra*, we will apply the *Westinghouse* balancing standard.

privacy protection because "applicants will feel uncomfortable about divulging their personal financial information" and "would feel particularly uncomfortable about divulging information about their spouse and children." App. at 790. As with those questions seeking medical information, the court found the intrusion was unjustified.

Other courts have held that financial information such as that sought by questions 25–29 is covered by the right to privacy. *See Barry v. City of New York*, 712 F.2d 1554, 1559 (2d Cir.), *cert. denied*, 464 U.S. 1017, 104 S.Ct. 548, 78 L.Ed.2d 723 (1983); *Plante v. Gonzalez*, 575 F.2d 1119, 1132–33 (5th Cir.1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979); *see also* Developments, *Public Employees Financial Disclosure Law Requiring Detailed Disclosure from Low-Echelon Employees Not Unconstitutional*, 62 Wash. U.L.Q. 337 (1984). *But see O'Brien v. DiGrazia*, 544 F.2d 543, 545–56 (1st Cir.1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977) ("Privacy in the sense of freedom to withhold personal financial information from the government or the public has received little constitutional protection").

▉ We have previously suggested that there are privacy interests in certain financial information. *DeMasi v. Weiss*, 669 F.2d 114, 120 (3d Cir.1982). As the Second Circuit stated, "public disclosure of financial information may be personally embarrassing and highly intrusive." *Barry v. City of New York*, 712 F.2d at 1561. Federal statutes according such information special status support the individual's reasonable expectation that it will remain confidential. *See, e.g.*, Freedom of Information Act, 5 U.S.C. § 552(b)(4), (exempting some personal financial information from release); Fair Credit Reporting Act, 15 U.S.C. §§ 1681(a)(4), 1681a(d), 1681b–1681d, (explicitly recognizing a "consumer's right

to privacy" and strictly limiting disclosure of personal financial information). Thus, we agree with the district court that financial information of the type sought in questions 25–29, albeit less intimate than medical information, is entitled to privacy protection.

However, as with medical information, SIU applicants' expectations of privacy are reduced by the personal data questionnaire required of all police department applicants. That questionnaire inquires into financial information, such as the identity of outstanding bills and loans, whether the applicant is "presently behind in payments on unpaid bills or loans," and whether the applicant received "any income in addition to [his or her] present job." App. at 522.

As justification for questions 25–29, Commissioner Tucker testified that financial information was relevant to employment in the SIU for two reasons. First, the Commissioner sought to learn the extent of the officers' overall debts in order to be able to avoid assigning officers with large debts "in an area like narcotics and vice, where the temptation is tremendous and corruption is pervasive." App. at 166. Second, the Commissioner sought income and gift information to insure that money obtained by SIU members "was received in an appropriate manner and was not received from any illicit or illegal enterprise." App. at 176.

The SIU questions are related to these goals. As in the case of federal officials, including judges, who are subject to searching annual financial disclosure, *see, e.g.*, 28 U.S.C. app. §§ 301–09, disclosure of financial information concerning the employee's spouse and dependent children [6] is required because their income generally enures to the employee and because disclosure could otherwise be evaded by the employee shifting his or her income and assets to the spouse or children.[7]

---

6. The FOP's standing to raise the privacy interests of the families of its members has not been challenged. In *Westinghouse*, we held that the employer could raise its employees' privacy claims when it was the party required to divulge the information. 638 F.2d at 574. *Accord* In

Re: *Search Warrant* (Sealed), 810 F.2d 67, 71 (3d Cir.1987). The same principle is applicable here.

7. We recognize that in *Denoncourt*, a plurality of the Pennsylvania Supreme Court held that questions seeking financial information as to spouses and other family members intruded on

■ We conclude that the strong public interest in avoiding corruption among officers assigned to a unit designed to perform investigations in areas traditionally susceptible to corruption outweighs police officers' limited privacy expectations in the financial information sought by the SIU questionnaire.

### 3. *Behavior Information*

A third group of questions seeks information of a personal nature about the applicant's behavior, and also asks about the arrest record of the applicant's family. Questions 15, 21 and 22 ask:

15. List any member of your family (including in-laws) who has ever been arrested. (Include name, date, place, charges, and final disposition if known.)
21. Do you gamble? a) How often? b) How much? c) What type?
22. Do you use alcoholic beverages: a) How often? b) How much?

App. at 538–39.

The district court believed that an employee "would not want to divulge such private information to an employer even if he was assured that the information would have limited circulation and would not be publicly disclosed." Therefore, it held that the information requested was entitled to privacy protection. App. at 788.

■ The issue raised by Questions 21 and 22 seeking information concerning gambling habits and alcohol consumption appears to be one of first impression, but the same analysis used heretofore is equally applicable. Of course, to the extent that gambling is done in public, such as at casinos, and drinking is done openly in bars or public functions, there is no privacy interest involved. The essence of private information is its general unavailability and the individuals' treatment of it as confidential. Information readily disclosed or available carries no protection. On the other hand, the questions also encompass private drinking habits and more secretive gambling, such as in a small group game. When the information is inherently private, it is entitled to protection.

As with medical and financial information, however, SIU applicants' justifiable privacy expectations in nondisclosure of information concerning their gambling and alcohol consumption are significantly reduced. Questions 21 and 22 of the SIU questionnaire are taken verbatim from the personal data questionnaire. App. at 526. In effect, therefore, all that is sought by the SIU questionnaire is an update of information already available to police officials, a minimal intrusion on SIU applicants' privacy interests.

There is obviously a strong public interest in avoiding corruption of the officers who investigate corruption. In support of question 21, Police Commissioner Tucker testified that he wished to avoid assigning "people who gamble extensively, large dollar volume" to SIU because "[t]he corruption that's existed in this city has been related to vice, been related to gambling." App. at 158.

There is also a strong public interest in assuring the effectiveness of the officers who investigate vice and corruption. In support of question 22, Commissioner Tucker testified that alcohol use is relevant to SIU assignment because "[v]ice and corruption in Philadelphia and internal investigations necessitate long-term surveillances in bars, and I do not want to place an employee under stress if he has a problem with alcoholism or an excessive drinking problem." App. at 160.

■ Based on Commissioner Tucker's testimony, we believe inquiry into SIU applicants' gambling habits and alcohol use may reasonably be expected to further the City's legitimate interest in staffing a spe-

---

those individuals' right to privacy under the Pennsylvania Constitution. 504 Pa. at 201–02, 470 A.2d at 949. We have explained in the text, p. 111 *supra,* that we construe that opinion as limited by the public disclosure provision. Moreover, the plurality in *Denoncourt* based its decision in large part on its belief that the reporting requirements as to family members which were addressed to a wide range of public officials did not "hold out much hope for effectiveness." *Id.* The questionnaire before us, addressed to a limited number of police officers applying for a special unit assignment, is distinguishable.

cial police investigatory unit with officers who are able to resist the many temptations that will await them. We hold that this interest justifies the minimal intrusion on applicants' privacy interests represented by questions 21 and 22.

Question 15, seeking information concerning the arrests of police officers' family members, stands on a different footing. Arrests are public by their very nature. Even if the arrest does not take place in public view, the booking at police headquarters is not private. Arrest records are not exempted from the Freedom of Information Act, and even investigatory records prepared prior to arrests are accorded only limited protection. 5 U.S.C. § 552(b)(7). Under Pennsylvania law, the Criminal History Record Information Act places no limits on disclosure of arrest records to police departments and allows limited disclosure of arrests to any individual making a request. 18 Pa.Cons.Stat.Ann. §§ 9102, 9121(a), 9121(b).[8]

■ In *Trade Waste*, we held that there was no privacy protection for "records of criminal conviction and pending criminal charges" because those matters were "by definition public." 780 F.2d at 234. Similarly, because arrests are by definition public, and because it is unlikely that anyone could have a reasonable expectation that an arrest will remain private information, we hold that arrest records are not entitled to privacy protection and we need not engage in the balancing analysis.

### 4. Other Concerns

In summary, the district court held that eleven of the twelve challenged questions seek information entitled to privacy protec-

tion under both the federal and Pennsylvania Constitutions and that this intrusion was not justified because the disputed questions needlessly included information irrelevant to the selection of an honest and efficient police force. We have concluded that although most of the information requested in the eleven questions is entitled to privacy protection, the questions are specific, relevant, and permissible because the City's need for the information overrides the applicants' rights not to disclose it.

■ The district court also referred to other reasons to support its injunction. One was the Commissioner's "inability to clearly explain" what may result if an applicant provides an inaccurate response. App. at 791. We find, on the contrary, that the consequences of inaccurate answers are clearly explained. The questionnaire itself states that answers must be certified by the applicant as follows:

I hereby certify that my written answers to all of the above questions are true and correct understanding that any false statements contained herein, are punishable and are subject to the penalties prescribed in 18 Pa. C.S.A. § 4904 (Unsworn Falsifications to Authorities).

App. at 535. We see no uncertainty on this issue in the record.[9]

The other concern expressed by the district court related to the lack of adequate safeguards to prevent unauthorized disclosure of applicants' responses, the issue we consider next.

### D.

#### Public Disclosure

■ One of the crucial factors in weighing the competing interests referred to in

---

**8.** The ACLU suggests that arrest records are entitled to privacy protection because the record of an arrest may be expunged if there has been no disposition after 18 months, 18 Pa.Cons.Stat. Ann. § 9122(a), and because use of arrest information is not permitted in certain circumstances. *See* 18 Pa.Cons.Stat.Ann. §§ 9124, 9125. However, these provisions cannot be viewed as removing arrest information from the public record since it remains on police blotters and court dockets. *See* 18 Pa.Cons.Stat.Ann. §§ 9104(a), (b), 9122(e).

**9.** The FOP suggests that the questionnaire itself is not part of a "meaningful inquiry" because the City's officials recognized that there could be no effective background investigation since the applicants would not be asked to sign waivers, presumably regarding their medical and financial information held by third parties. Appellee's Brief at 37–39. Apparently, the FOP is suggesting that applicants may give false responses to the questionnaire if the City is unable to check their veracity. We see no basis in the record for such a cynical position, and we reject it forthwith.

*Westinghouse* is "the adequacy of safeguards to prevent unauthorized disclosure." 638 F.2d at 578. It would be incompatible with the concept of privacy to permit protected information and material to be publicly disclosed. The fact that protected information must be disclosed to a party who has a particular need for it, as the City has in this case, does not strip the information of its protection against disclosure to those who have no similar need.

The City argues that its safeguards against unnecessary disclosure are adequate because the Fact Sheet promises that the questionnaire responses will not be kept on file and will either be returned to the applicants or destroyed, App. at 534, and because Commissioner Tucker repeatedly asserted that during the application process only those few members of the Department requiring access to the information will see the responses. App. at 183, 187–88. We accept the sincerity with which these promises are made but nonetheless agree with the district court that they do not supply the necessary safeguards.

Safeguards against disclosure of private material have been held to be adequate when there exists a statutory penalty for unauthorized disclosures, *see Whalen*, 429 U.S. at 605–06, 97 S.Ct. at 879 (statutory sanctions for improper disclosure of New York prescription records); when there exist security provisions to prevent mishandling of files coupled with an express regulatory policy prohibiting disclosure, *see Shoemaker*, 795 F.2d at 1144 (Racing Commission regulations concerning confidentiality of jockey drug test results); *Westinghouse*, 638 F.2d at 580 (locked cabinets, data removal after six months and regulation stating "no disclosure will be made of information of a personal and private nature"); and in a unique situation when, even absent an explicit statutory or regulatory policy, the record supported the conclusion that those officials with private information would not disclose it. *See Nixon*, 433 U.S. at 462, 96 S.Ct. at 2799 (privacy adequately protected by return of documents to owner coupled with archivists'

"unblemished record for discretion" in avoiding public disclosure).

 In contrast, we find a complete absence of comparable protection of the confidential information to be disclosed in response to the SIU questionnaire. There is no directive limiting access to the responses to specific persons or specifying the handling and storage of the responses. Commissioner Tucker admitted that it was inevitable that those officials responsible for the SIU application process would remember at least some of the information in the responses. App. at 195. Apparently, there is no statute or regulation that penalizes officials with confidential information from disclosing it. At least, none has been called to our attention by the City. We cannot make the assumption about nondisclosure that the *Nixon* Court made in the distinctive situation regarding the President's papers. Moreover, we are troubled by the fact that although there has been ample opportunity since the district court's opinion to rectify the absence of any procedure to prevent disclosure, neither the City nor the Commissioner has undertaken to promulgate confidentiality directives or regulations regarding the responses.

For the foregoing reasons, we will direct the district court on remand to continue the injunction as to questions 18, 19, 20, 21, 22, 25, 26, 27, 28 and 29 until the City, the Commissioner, or other appropriate official establishes written, explicit, and binding rules that contain adequate safeguards against unnecessary disclosure of the confidential information elicited in response to the SIU questionnaire.

## IV.

### *Associational Rights*

The final question challenged by the FOP is Question 30 which asks:

30. Offices and Directorships: List all such positions in any entity or association whether for profit or not for profit, held by you, your spouse, or your minor

dependent children during 1985. If none, write "none".

App. at 543.

The district court found that question 30 violated applicants' First Amendment rights. The court found the question was overbroad because it would require disclosure of membership in groups irrelevant to suitability for SIU. The court did not "perceive a need for question 30 as part of the application process" because Commissioner Tucker had testified that the information gleaned from responses would be used only to avoid conflicts in assignment of SIU members. App. at 796.

On appeal, the FOP does not argue that Question 30 is also a privacy intrusion and hence we have no occasion to consider it as such. We will confine ourselves to considering the facial challenge to that question as an invasion of the applicants' associational rights.

Question 30 of the SIU questionnaire requires each SIU applicant to disclose all organizational offices and directorships held by the applicant, his or her spouse and dependent children. Non-profit organizations are specifically included. Thus, question 30 would require SIU applicants to disclose, *inter alia,* memberships in political organizations, clubs, religious organizations, and social groups.

It is, of course, now well established that there is a constitutionally protected "freedom of association". In one aspect, it protects an individual's "choice[ ] to enter into and maintain certain intimate human relationships," which is "a fundamental element of personal liberty." *Roberts v. United States Jaycees,* 468 U.S. 609, 617–18, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984). Its other aspect "recognize[s] a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.* at 618, 104 S.Ct. at 3249.

Compelled disclosure of memberships can "seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley v. Valeo,* 424 U.S.

1, 64, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976). Thus, it can be justified only when the interests of the state survive exacting scrutiny and when there is "a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed." *Id.* (footnotes omitted). *See also Brown v. Socialist Workers '74 Campaign Comm.,* 459 U.S. 87, 91–92, 103 S.Ct. 416, 419–20, 74 L.Ed.2d 250 (1982); *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960); *NAACP v. Alabama,* 357 U.S. 449, 463, 78 S.Ct. 1163, 1172, 2 L.Ed.2d 1488 (1958).

The City attempts to justify Question 30 on the following basis:

> The record establishes that the purpose of the inquiry is threefold: (1) to provide a complete financial picture of the applicant and his family (432a–433a); (2) to detect possible conflicts of interest in assignment among applicants (180a); and (3) to provide a positive source of information concerning the extent of an applicant's community, civic and fraternal involvement (180a).

Appellants' Brief at 36.

With respect to the first justification, the question is not limited to positions in financial or business organizations, as were the questions upheld in the cases on which the City relies. *E.g., Barry v. City of New York,* 712 F.2d 1554 (2d Cir.), *cert. denied,* 464 U.S. 1017, 104 S.Ct. 548, 78 L.Ed.2d 723 (1983); *Plante v. Gonzalez,* 575 F.2d 1119 (5th Cir.1978), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979). The second justification, potential conflicts of interest in assignment, is too tenuous a basis to warrant this broad inquiry at the application stage. As to the third reason given, if the question is really intended to "provide a positive source" to support the application, as the City contends, it can be made optional. Also, it hardly seems likely that the memberships of a spouse and child would or should be relevant to the applicant's fitness for an SIU position.

 We recognize that the record contains no evidence that would support a

finding that a required response to this question would chill the applicant's or family member's associational activities. However, in light of the absence of any legitimate interest asserted by the City to justify the inquiry, we conclude that the question would not even withstand a more relaxed scrutiny than that usually applied to questions which seek disclosure of associational ties. Therefore, Question 30 need not be answered in its present form and at this time.

## V.

### Conclusion

The idea of a special investigation unit within the Philadelphia Police Department was the response of its new Police Commissioner to a wave of graft and other corruption within the 8,000–member department of the country's fourth largest city. Commissioner Tucker was faced with more than mere rumor and charges. It is public knowledge that within the past four years, thirty-one police officers, including the Department's second in command, have been convicted on federal corruption charges. N.Y. Times, Oct. 15, 1986, at 17, col. 2. At least nine other current and former police officers have since been indicted by a state grand jury. *Id.*

It is a sad commentary on current urban life that we can say with assurance that Philadelphia is not the only city so tainted and that such dismal breaches of the public trust will undoubtedly recur. Faced with the formidable task of cleaning house, Commissioner Tucker proposed a new approach specifically designed to centralize those police operations most susceptible to corruption in one unit and to tighten their control and supervision. The Special Investigations Unit represents one part of the City's commendable effort to quash any resurgence of its previously scandalous reputation as the city "most corrupt and the most contented." L. Steffens, The Shame of the Cities 136 (1904).

Such an investigation unit can fulfill the function for which it was designed only if it can be staffed with personnel who will not follow the path taken by some of their predecessors. The selection of such personnel necessarily entails careful screening. The SIU questionnaire was designed for that purpose. In its legitimate pursuit of necessary information, the questionnaire intrudes into areas of the applicants' lives to which we customarily accord privacy protection. However, police officers, like other public officials, have long been aware that the nature of their work subjects them to inquiry into personal data about their private lives. Some of the questions in the SIU questionnaire may be somewhat more personal or wider in scope than the questions officers originally answered as part of their initial employment applications, but the sensitivity of the work that the unit will perform amply justifies that additional intrusion. Our upholding of most of the questions does not suggest that other intrusive inquiries would necessarily be upheld in the absence of equally compelling circumstances. We confine ourselves to the case before us.

Nothing in the establishment of a special investigation unit or in our decision upholding the legitimacy of most of the disputed questions is intended to disparage the integrity and capability of the many thousands of Philadelphia police officers who regularly perform their duties with high honor. The recent corruption trials have made their task more difficult. If the SIU operates successfully, it should restore full public confidence in the Department.

For the above reasons, we will vacate the district court's order granting a permanent injunction and remand so that the court can enter an order enjoining the City from including questions 18–22 and 25–29 in the SIU questionnaire until the City has taken the requisite steps to protect against unauthorized disclosure and permanently enjoining the inclusion of Question 30 in its present form. Each party to bear its own costs.