Aric HERNDON, a minor, by Christiana and John HERNDON, as Guardians, and in their own right, and John Reinhard, III, a minor, by John and Ellen Reinhard, as Guardians, and in their own right, Plaintiffs,

v.

CHAPEL HILL–CARRBORO CITY BOARD OF EDUCATION; Ken Touw, Sue Baker, Lavonda Burnette, Mary Bushnell, Judith Ortiz, Mark Royster, Ruth Royster, in their official capacities as members of the Chapel Hill–Carrboro City Board of Education; and Neil G. Pedersen, in his official capacity as Superintendent of Chapel Hill–Carrboro City Schools, Defendants.

Civ. No. 1:94CV00196.

United States District Court,
M.D. North Carolina,
Durham Division.

July 19, 1995.

Robert H. Edmunds, Jr., Stern, Graham & Klepfer, Greensboro, NC, William H. Mellor, III, Clint Bolick, Scott G. Bullock, Institute for Justice, Washington, DC, for Aric Herndon, Christiana Herndon, John Herndon, John Reinhard, Ellen Reinhard.

John G. McCormick, Chapel Hill, NC, Eric W. Hinson, Law Office of John G. McCormick, P.A., Chapel Hill, NC, for Chapel Hill–Carrboro City Board of Education, Ken Touw, Sue Baker, Lavonda Burnette, Mary Bushnell, Judith Ortiz, Mark Royster, Ruth Royster, Neil G. Pedersen.

Richard A. Schwartz, Richard Schwartz & Associates, Raleigh, NC, Joseph R. Guerra, Dennis D. Hirsch, Sidley & Austin, Washington, DC, Robert Teir, American Alliance for Rights & Responsibilities, Washington, DC, for Kate Breen, Amy Cloud, Amy Rouse.

## MEMORANDUM OPINION

BULLOCK, Chief Judge.

This case, involving a program in the Chapel Hill–Carrboro School System requiring students to perform fifty (50) hours of unpaid community service outside of the normal school hours during their high school years as a condition of their graduation, comes before the court on cross-motions for summary judgment filed by all parties. Plaintiffs seek a declaration that the Program violates the United States Constitution and an injunction against its implementation. Plaintiffs contend that the Program is unconstitutional because: (1) it constitutes involuntary servitude prohibited by the Thirteenth Amendment; (2) it violates plaintiff parents' right to direct the upbringing and education of their children in violation of the Ninth and Fourteenth Amendments; (3) it deprives plaintiff students of their personal liberty in violation of the Fourteenth Amendment; and (4) it violates the privacy rights of plaintiff students in violation of the Ninth and Fourteenth Amendments. Because the court finds that the Program is not unconstitutional on any of the grounds raised by Plaintiffs, summary judgment will be granted for Defendants on all of Plaintiffs' claims.

I.

The parties have stipulated to most of the facts crucial to the disposition of this case, and the material facts are undisputed.

Plaintiffs are students, and the parents and guardians of students, in the Chapel Hill–Carrboro School System. Suit is brought by the parents and guardians in their own behalf and in behalf of the students.

Defendant Chapel Hill–Carrboro City Board of Education is a governmental agency and body corporate organized under the education code of North Carolina, N.C.Gen.Stat. § 115C–40. Its members are charged with administering the Chapel Hill–Carrboro City School System. The system's high school, Chapel Hill High School, is located in Chapel Hill, North Carolina, and had a 1994–95 enrollment of 2,061 students in grades nine through twelve. Defendants Ken Touw, Sue Baker, Lavonda Burnette, Mary Bushnell, Judith Ortiz, Mark Royster, and Ruth Royster were, at the time this action was filed, individuals holding elective office as members of the Chapel Hill–Carrboro City Board of Education and each is sued in his or her official capacity.

At the time this action was filed, Defendant Neil G. Pedersen was superintendent of the Chapel Hill–Carrboro City Schools and an agent and employee of Defendant Board of Education. Defendant Pedersen is sued in his official capacity.

Beginning with the graduating class of 1997, students enrolled in the Chapel Hill–Carrboro School System are required to complete fifty (50) hours of community service during grades nine through twelve as a condition to receiving a diploma.[1] Failure to complete the Program makes a student ineligible for graduation and the Program does not contain an opt-out provision for students who object to performing community service. The community service required by the Program must be performed after school, on weekends or holidays, or over summer recesses. Students are required to perform a minimum of two different types of service. Clerical work is limited to no more than eight (8) hours, as are fundraising activities. The community service coordinator at Chapel Hill High School keeps on file a list of approved agencies and organizations for whom students may work to satisfy the requirements of the Program. The list of organizations for which students may work is extensive and includes many with significantly different purposes and philosophies.[2]

Students may also receive credit for service performed for organizations which are not included on the list of approved organizations. However, in order for a student to receive credit for service performed for an organization not included on the list, a student must receive approval from the Service Learning Committee, a group of teachers, students, and members of community organizations charged with administering the Program. Ultimately, however, the principal of the high school is the final decision-maker concerning community service credit.

Services for which students receive monetary compensation or which are required as a form of restitution cannot be used to satisfy the requirements of the Program. Credit may not be received for service to a for-profit organization unless the service provides a benefit to the clients of such organization that they otherwise would not receive. Service provided to a group such as a church or student club, which primarily benefits the organization's members, will not be approved. Neither may activities that promote political parties or individual candidates be credited. Students must set their own work schedule and provide their own transportation to and from the location at which they perform community service. The organizations for which students perform their services are responsible for providing any training or necessary supervision. When students arrive to perform their service, students must sign in with the organization and a contact person with the organization must document the hours the student works. Students are required to turn verified time sheets in to the school. Each time a student performs service for an organization, he or she is thereafter required to reflect on any "memories or special feelings" gained from the particular service experience. After students complete the fifty (50) hours of re-

---

1. The hour requirements for students who transfer in to the Chapel Hill–Carrboro School System after the ninth grade are prorated.

2. See Appendix.

quired service, they must submit a one-to-two-page paper reflecting on their service experiences.

## II.

Plaintiffs allege that the Program imposes involuntary servitude upon plaintiff students in violation of the Thirteenth Amendment to the United States Constitution. Plaintiffs base this allegation on the fact that Defendants have conditioned the receipt of a public high school diploma on the students having to work for others against their will without compensation.

▰ The Thirteenth Amendment declares that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the parties shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1. Although Section 2 authorizes Congress to enact legislation to enforce the Amendment, the Amendment has been held to be "self-executing without any ancillary legislation, so far as its terms are applicable to any existing state of circumstances." *Civil Rights Cases,* 109 U.S. 3, 20, 3 S.Ct. 18, 28, 27 L.Ed. 835 (1883). The Thirteenth Amendment was adopted to eliminate slavery and "those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results." *Butler v. Perry,* 240 U.S. 328, 332, 36 S.Ct. 258, 259, 60 L.Ed. 672 (1916). The purpose of the Thirteenth Amendment was "not merely to end slavery but to maintain a system of completely free and voluntary labor throughout the United States." *Pollock v. Williams,* 322 U.S. 4, 17, 64 S.Ct. 792, 799, 88 L.Ed. 1095 (1944).

▰ The Supreme Court early recognized that the government may legitimately require its citizens to perform certain services for the benefit of the common good without violating the Thirteenth Amendment because of historical exclusions from the Thirteenth Amendment which allow their imposition. *See Selective Draft Law Cases,* 245 U.S. 366, 390, 38 S.Ct. 159, 165, 62 L.Ed. 349 (1918) (upholding the government's power to compel military service); *Butler,* 240 U.S. at 332–33,

36 S.Ct. at 258–59 (upholding a state law that required men to work on the roads and bridges of the state, stating that the Thirteenth Amendment "was not intended to interdict enforcement of those duties which individuals owe to the State, such as services in the army, militia, on the jury, etc."); *Robertson v. Baldwin,* 165 U.S. 275, 282–88, 17 S.Ct. 326, 329–31, 41 L.Ed. 715 (1897) (upholding a state statute authorizing the punishment and return of deserting seamen in the merchant service).

Lower federal courts have also recognized that a state may require its citizens to provide certain types of public service because of a civic duty owed to the state by its citizens or because of the public benefit conferred by the service. *See, e.g., Brogan v. San Mateo County,* 901 F.2d 762, 764 (9th Cir.1990) (upholding a county's workfare program whereby the receipt of public assistance was conditioned on the recipient's participation in a county work program); *Delgado v. Milwaukee County,* 611 F.Supp. 278, 280 (E.D.Wis.1985) (holding a similar work relief program valid), *aff'd,* 789 F.2d 919 (7th Cir. 1986); *United States v. 30.64 Acres of Land,* 795 F.2d 796, 801 (9th Cir.1986) (upholding a requirement that attorneys perform *pro bono* work) (citing *White v. United States Pipe & Foundry Co.,* 646 F.2d 203, 205 n. 3 (5th Cir.1981)); *Bobilin v. Board of Educ.,* 403 F.Supp. 1095, 1104 (D.Haw.1975) (upholding regulations that required public school children to work in the school cafeteria because the imposition on the students was "more than outweighed by the conceded public benefit involved").

▰ While this case does not fit neatly within the ambit of any previously recognized historical exclusions from the Thirteenth Amendment, the court is aware of "[t]he importance of public schools in the preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests." *Ambach v. Norwick,* 441 U.S. 68, 76, 99 S.Ct. 1589, 1594, 60 L.Ed.2d 49 (1979). "[T]here is a legitimate and substantial community interest in promoting respect for authority and traditional values be they social, moral, or political." *Board of Educ. v. Pico,* 457 U.S. 853, 864,

102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982). The court is mindful of the purposes and intended effects of the Chapel Hill–Carrboro Program and the Supreme Court's recognition that "local school boards must be permitted to establish and apply their curriculum in such a way as to transmit community values." *Id.* (internal quotations omitted).

In *Immediato v. Rye Neck Sch. Dist.,* 873 F.Supp. 846 (S.D.N.Y.1995), a case directly on point, the district court, in considering a New York public school program requiring forty (40) hours of community service challenged under the Thirteenth Amendment, held that such a program did not involve the type of physical force or legal sanction present in Supreme Court decisions finding involuntary servitude, and that the board of education reasonably could conclude that the benefit to the student outweighed the incidental burden of the labor requirement.

In another case on point, the Third Circuit held that a Pennsylvania public school program which required sixty (60) hours of community service during a student's four (4) years of high school was not violative of the Thirteenth Amendment. *Steirer v. Bethlehem Area Sch. Dist.,* 987 F.2d 989 (3d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 85, 126 L.Ed.2d 53 (1993). That court, "taking a contextual approach to involuntary servitude by confining the Thirteenth Amendment to those situations that are truly 'akin to African slavery,'" found that there was "no basis in fact or logic which would support analogizing a mandatory community service program in a public high school to slavery." *Id.* at 1000. In so holding, the court noted that a critical factor in every case finding involuntary servitude has been that the victim's only choice was between performing the labor on one hand and physical and/or legal sanctions on the other, and that when there are alternatives to performing the labor, even though such choices may not be appealing, the required labor does not constitute involuntary servitude. *Id.*

Both the *Immediato* and *Steirer* courts are correct that the Supreme Court has not extended the scope of Thirteenth Amendment involuntary servitude beyond servitude coerced by legal or physical means. *See*

*United States v. Kozminski,* 487 U.S. 931, 942–44, 108 S.Ct. 2751, 2759–61, 101 L.Ed.2d 788 (1988). Nor have the Fourth Circuit and the majority of lower federal courts held that sanctions other than legal or physical coercion implicate the Thirteenth Amendment. *See, e.g., United States v. Harris,* 701 F.2d 1095, 1100 (4th Cir.), *cert. denied,* 463 U.S. 1214, 103 S.Ct. 3554, 77 L.Ed.2d 1400 (1983) (upholding convictions under 18 U.S.C. § 1584 based on the defendants' use of physical coercion, and stating that "it is clear that a mere reminder by the employer that the consequences of leaving will be exceedingly bad (*e.g.,* deportation) is not enough" to support a conviction under the statute (citing *United States v. Shackney,* 333 F.2d 475 (2d Cir.1964) (holding that a conviction under 18 U.S.C. § 1584 could not be supported "by a threat to have the employee sent back to the country of his origin, at least absent circumstances which would make such deportation equivalent to imprisonment or worse")))); *United States v. Booker,* 655 F.2d 562 (4th Cir.1981) (upholding convictions under 18 U.S.C. § 1583 (a companion statute to § 1584) for kidnapping another person with the intent to hold them as a slave because the defendants' threats "of violence or confinement, backed sufficiently by deeds as in this case, suffice[d] to subjugate human beings to the will of another in violation of the thirteenth amendment and § 1583").

■ In the present case, however, this court will not rely on the fact that a student, in lieu of participating in the Program, is not prevented from obtaining a diploma at a private school, transferring to another public school system, seeking a GED, or dropping out of school. As Justice Kennedy wrote in *Lee v. Weisman,* the graduation prayer case, to say that a high school student has the choice not to participate in his or her high school graduation is "formalistic in the extreme." 505 U.S. 577, 594–95, 112 S.Ct. 2649, 2659, 120 L.Ed.2d 467 (1992). Nevertheless, the community service required in this case does not come within the general spirit of the Thirteenth Amendment's prohibition of slavery and involuntary servitude and is simply not the "servitude" the Thir-

teenth Amendment was enacted to guard against.

The Program, requiring only fifty (50) hours of service over a period of four (4) years to any of a multitude of organizations, cannot be said to be a form of compulsory labor "akin to African slavery." The students are allowed to choose the organizations for which they will work from a wide variety of organizations and they are free to schedule the hours which they wish to work. There is nothing in the record to indicate that the conditions under which the students work are unreasonable or oppressive. Plaintiffs have a great deal of free time otherwise to do as they wish, including engaging in other forms of community service outside of the fifty (50) hours required by the Program.

The requirements of the Program are not "in any-sense comparable to the odious practice the Thirteenth Amendment was designed to eradicate." *Memphis v. Greene*, 451 U.S. 100, 128, 101 S.Ct. 1584, 1600, 67 L.Ed.2d 769 (1981). To regard the Program, possessing none of the undesirable incidents of slavery, as violative of the Thirteenth Amendment would "trivialize the great purpose of that charter of freedom." *Id.*

## III.

Plaintiffs' complaint alleges that the Program is violative of plaintiff parents' Ninth and Fourteenth Amendment right to direct and control the upbringing and education of their children. While plaintiff parents state that they support private, charitable efforts and voluntary service to the community, they allege that they fundamentally believe that the decision to help others must always come from one's own conscience and that it cannot be imposed by the government. Plaintiff parents state that they attempt to impart these values to their children as well. Plaintiffs do not challenge the legitimacy of the interests offered by Defendants to justify the Program. Neither do Plaintiffs contest the ability of Defendants to impart these values to plaintiff students "in some manner." However, Plaintiffs object to the *means* by which Defendants attempt to impart these interests to plaintiff students through the Program. Plaintiffs allege that the Program

infringes upon a fundamental right, that of plaintiff parents to direct the upbringing and education of their children. Plaintiffs argue that because this right is infringed the Program is invalid.

■ The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive an individual of life, liberty, or property without due process of law." U.S. Const. amend. XIV. The Due Process Clause "has been understood to contain a substantive component ..., one 'barring certain government actions regardless of the fairness of the procedures used to implement them.'" *Planned Parenthood v. Casey*, 505 U.S. 833, ——, 112 S.Ct. 2791, 2804, 120 L.Ed.2d 674 (1992) (quoting *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986)). The rights guaranteed by the Due Process Clause serve as "bulwarks ... against arbitrary legislation." *Hurtado v. California*, 110 U.S. 516, 532, 4 S.Ct. 111, 119, 28 L.Ed. 232 (1884), *quoted in Casey*, 505 U.S. at ——, 112 S.Ct. at 2804.

A crucial determination in examining the constitutionality of a challenged governmental statute or regulation under the substantive component of the Due Process Clause, and one on which the parties disagree, is the appropriate standard of review. The Supreme Court has set forth two standards of review for use in cases involving legislation challenged under the substantive component of the Due Process Clause: "strict scrutiny" and "rational basis."

■ A challenged governmental statute or regulation that burdens a "fundamental" interest is examined under the strict scrutiny test. *See Zablocki v. Redhail*, 434 U.S. 374, 388, 98 S.Ct. 673, 682, 54 L.Ed.2d 618 (1978). Under the strict scrutiny test, the challenged legislation is held unconstitutional unless the government can show that the legislation is "justified ... by a 'compelling state interest'" and is "narrowly drawn to express only the legitimate state interests at stake." *Roe v. Wade*, 410 U.S. 113, 155, 93 S.Ct. 705, 728, 35 L.Ed.2d 147 (1973) (citations omitted).

■ A challenged governmental statute or regulation that "has no substantial impact

on any fundamental interest and does not 'affect with particularity any protected class'" is examined under the rational basis test. *Lyng v. International Union, UAW,* 485 U.S. 360, 370, 108 S.Ct. 1184, 1192, 99 L.Ed.2d 380 (1988) (citations omitted). Under the rational basis test, challenged legislation that "'is rationally related to a legitimate governmental interest'" must be upheld. *Id.* (quoting *Department of Agriculture v. Moreno,* 413 U.S. 528, 533, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782 (1973)). The rational basis "standard of review is typically quite deferential." *Id.* Legislation examined under the rational basis test "carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality." *Hodel v. Indiana,* 452 U.S. 314, 331–32, 101 S.Ct. 2376, 2387, 69 L.Ed.2d 40 (1981). The challenger of such legislation has a "heavy burden." *Id.* at 332, 101 S.Ct. at 2387.

■ The Supreme Court recognized long ago that the liberty guaranteed by the Fourteenth Amendment includes the right of parents to direct the upbringing and education of their children. *Meyer v. Nebraska,* 262 U.S. 390, 399, 401, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923) (recognizing the right to "establish a home and bring up children" and the "power of parents to control the education of their own"); *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925) (recognizing the "liberty of parents and guardians to direct the upbringing and education of children under their control"). More recently, the Supreme Court has recognized that "[t]he history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder,* 406 U.S. 205, 232, 92 S.Ct. 1526, 1541, 32 L.Ed.2d 15 (1972).[3]

■ The importance of the right of parents to direct the education and upbringing of their children is well established. However, the Supreme Court's treatment of this right makes it clear that the right of individual parents to exert pre-emptive control over the curriculum of public schools is not a "fundamental" one subject to "strict scrutiny."

In early cases in which the liberty of parents and guardians to direct the upbringing and education of their children was first being defined, the Court held that "this liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the State to effect." *Meyer,* 262 U.S. at 399–400, 43 S.Ct. at 627. In *Meyer,* a state law forbidding the teaching, in any public or private school, of any modern foreign language before the eighth grade was contested as interfering with foreign language teachers' right to teach, with the right of pupils to acquire knowledge, and with the right of parents to control the education of their children. *Id.* at 401, 43 S.Ct. at 627. The Court struck down the statute as applied as "arbitrary and without reasonable relation to any end within the competency of the State." *Id.* at 403, 43 S.Ct. at 628.

Two years later the Court in *Pierce* entertained a challenge to a state law requiring children between ages eight and sixteen to attend public school on the grounds that it interfered with the right of parents to direct the upbringing and education of their children. *Pierce,* 268 U.S. at 532, 45 S.Ct. at 572. Invalidating the law, the Court held that

> [u]nder the doctrine of *Meyer v. Nebraska,* 262 U.S. 390 [43 S.Ct. 625, 67 L.Ed. 1042] we think it entirely plain that the Act ... unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control. As often heretofore pointed out, rights guaranteed by the Constitution

---

**3.** The Supreme Court has recognized that "[t]he *Meyer–Pierce–Yoder* 'parental' right and the privacy right ... may be no more than verbal variations of a single constitutional right." *Runyon v. McCrary,* 427 U.S. 160, 178 n. 15, 96 S.Ct. 2586, 2598 n. 15, 49 L.Ed.2d 415 (1976) (citing *Roe v. Wade,* 410 U.S. 113, 152–53, 93 S.Ct. 705, 726–27, 35 L.Ed.2d 147 (1973) (citing *Pierce,* 268 U.S. at 535, 45 S.Ct. at 573–74, and *Meyer,* 262 U.S. 390, 43 S.Ct. 625)).

may not be abridged by legislation which has no reasonable relation to some purpose within the competency of the State. The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.

*Pierce,* 268 U.S. at 534–35, 45 S.Ct. at 573.

█ More recently, the Court clarified its holding in *Pierce* and reinforced the general rule that the rights of parents to direct the education and upbringing of their children "may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations." *Yoder,* 406 U.S. at 215, 92 S.Ct. at 1533. In *Yoder,* a state law requiring all children under the age of sixteen to attend public or private school was challenged by members of the Old Order Amish Religion. These members believed that their children's attendance at high school was contrary to their religion and way of life and believed that by sending their children to high school they would risk censure of the church and endanger their salvation and that of their children. *Id.* at 209, 92 S.Ct. at 1530. Because the law implicated the Amish's rights to the free exercise of their religion as well as their parental rights, the Court applied a heightened standard of review to invalidate the requirement as applied to the Amish. *Id.* at 233, 234–36, 92 S.Ct. at 1542, 1542–43. The Court applied a heightened standard not because it found the rights of the parents in that case to be fundamental in and of themselves, but because the assertion of the rights of parents was *combined with a free exercise claim. Id.* at 233, 92 S.Ct. at 1542. The Court said that "when the interests of parenthood are combined with a free exercise claim ..., more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment." *Id.* at 233, 92 S.Ct. at 1542. The Court further stated that "[a] way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations." *Id.* at 215, 92 S.Ct. at 1533. In the present case, Plaintiffs do not object to the Program for religious reasons.[4] Rather, in regard to their claim for infringement upon their parental rights, plaintiff parents philosophically disagree with certain secular values sought to be taught to plaintiff students by the Program.

Finally, in a case holding that the prohibition of racial discrimination in admissions to private schools does not violate the right of parents to direct the upbringing and education of their children, the Supreme Court did not treat the right of the parents as a "fundamental right" which would require the application of strict scrutiny to any state infringement upon it. *See Runyon v. McCrary,* 427 U.S. 160, 178–79, 96 S.Ct. 2586, 2598–99, 49 L.Ed.2d 415 (1976) (stating that parents "have no constitutional right to provide their children with private school education unfettered by reasonable government regulation" (citing *Yoder,* 406 U.S. at 213, 92 S.Ct. at 1532; *Pierce,* 268 U.S. at 534, 45 S.Ct. at 573; *Meyer,* 262 U.S. at 402, 43 S.Ct. at 627–28)).

█ Because Plaintiffs' objection to the Program arises out of purely secular concerns, the right asserted by plaintiff parents in this case is not a "fundamental" right. This conclusion is in accord with several other lower federal courts which have held that other types of state regulation have not infringed upon any fundamental right of parents to supervise the upbringing and education of their children. *See Murphy v. Arkansas,* 852 F.2d 1039, 1043 (8th Cir.1988); *Null v. Board of Educ.,* 815 F.Supp. 937, 939 (S.D.W.Va.1993); *see also Cornwell v. State Bd. of Educ.,* 428 F.2d 471, 472 (4th Cir. 1970), *aff'g* 314 F.Supp. 340 (D.Md.1969) (holding the claim that plaintiff parents had an exclusive constitutional right to teach their children about sexual matters in their own homes was so insubstantial as not to

4. See footnote 7, *infra.*

confer jurisdiction upon a three-judge court under old 28 U.S.C. § 2281), *cert. denied,* 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246 (1970).

Therefore, the constitutionality of the Chapel Hill–Carrboro Board of Education Program will be determined under the rational basis test.[5] The rational relation standard is especially appropriate in cases examining specific school-required educational programs because "courts are not school boards or legislatures, and are ill-equipped to determine the 'necessity' of discrete aspects of a State's program of compulsory education." *Yoder,* 406 U.S. at 235, 92 S.Ct. at 1543. Moreover, as the Supreme Court has stated, "[t]here is no doubt as to the power of a State . . . to impose reasonable regulations for the control and duration of basic education." *Id.* at 213, 92 S.Ct. at 1532.

In order for challenged legislation to pass muster under the rational-basis test, there must be some legitimate state interest to which the legislation is rationally related. Defendants contend that the State has a legitimate interest in educating students in its public high schools and in transmitting community values and instilling skills and habits of good citizenship to these students. Plaintiffs do not contest that these interests are indeed legitimate and within the competency of the State to effect. *See Pico,* 457 U.S. at 864, 102 S.Ct. at 2806 ("public schools are vitally important in the preparation of individuals for participation as citizens, and as vehicles for inculcating fundamental values necessary to the maintenance of a democratic political system. . . . [L]ocal school boards must be permitted to establish and apply their curriculum in such a way as to transmit community values, and . . . there is a legitimate and substantial community interest in promoting respect for authority and traditional values be they social, moral, or political" (internal quotations and citations omitted)); *Yoder,* 406 U.S. at 221, 92 S.Ct. at 1536; *Brown v. Board of Educ.,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954); *Pierce,* 268 U.S. at 534, 45 S.Ct. at 573. As set forth below, the court finds that the requirements of the Program are rationally related to these legitimate state interests.

Defendants state that a community service program like the one sought to be implemented teaches participating students a variety of social, intellectual, and occupational skills, and instills in students awareness of civic responsibilities. Defendants contend that a community service program "allows students to develop a wider range of personal, intellectual, academic and social skills—such as teamwork, problem solving, negotiation, communication, planning, and evaluation—that will help them become effective employees, colleagues, citizens, and leaders." Defendants state that participants in school community service programs have reported

---

5. In its cases dealing with parental rights, the Supreme Court has indicated that legislation which bears some "reasonable relation" to a legitimate state interest should be upheld. The Supreme Court's use of the words "reasonable relation" does not preclude the application of the "rational basis" test in this case. The rational basis test generally requires that challenged legislation be "rationally related to a legitimate governmental interest." *Lyng,* 485 U.S. at 370, 108 S.Ct. at 1192 (quoting *Department of Agriculture v. Moreno,* 413 U.S. 528, 533, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782 (1973)). While the Supreme Court has spoken about a "reasonable relation" to a legitimate state interest in cases dealing with parental rights, the Court has used the words "reasonable relation" and "rational relation" interchangeably in other cases to refer to the rational basis test used in substantive due process and equal protection analysis. *See, e.g., Western & Southern Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 668, 101 S.Ct. 2070, 2083, 68 L.Ed.2d 514 (1981) ("In determining whether a challenged classification is rationally related to achievement of a legitimate state purpose, we must answer two questions: (1) Does the challenged legislation have a legitimate purpose? and (2) Was it reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose?"); *Bankers Life & Cas. Co. v. Crenshaw,* 486 U.S. 71, 85, 108 S.Ct. 1645, 1654, 100 L.Ed.2d 62 (1988) (holding a Mississippi law requiring certain unsuccessful appellants to pay an assessment of 15% of the judgment awarded against them to "pass muster under the rational-basis test" because "the means that the State has chosen are 'reasonably tailored to achieve [the State's legitimate] ends' " (quoting *Lindsey v. Normet,* 405 U.S. 56, 78, 92 S.Ct. 862, 876–77, 31 L.Ed.2d 36 (1972))); *Friedman v. Rogers,* 440 U.S. 1, 17, 99 S.Ct. 887, 898, 59 L.Ed.2d 100 (1979) (upholding under the rational basis test a Texas act requiring a majority of the state optometry board to be members of a certain professional organization of optometrists because the law was "related reasonably to the State's legitimate purpose of securing a Board that will administer the Act faithfully").

"a positive effect on their concern for fellow human beings, self-motivation to learn, participate and achieve, sense of usefulness in relation to the community, sense of responsibility to their group, responsibility for their own life, awareness of community problems, communication skills, and sense of confidence, competence, and self-awareness."

■ The Chapel Hill–Carrboro Board of Education could reasonably conclude that the Program is rationally related to the legitimate state interest of educating students enrolled in its public schools and in preparing them for participation in society as citizens. The implementation of the Program is not arbitrary, and the Program's requirements are not unreasonable or overly onerous. Plaintiffs have not met their "heavy burden" of clearly showing that the Program is arbitrary and irrational. *See Hodel*, 452 U.S. at 331–32, 101 S.Ct. at 2386–87. Therefore, the Program does not violate the plaintiff parents' substantive due process rights.

■ Plaintiffs' complaint also alleges that the Defendants' Program also violates the *student* Plaintiffs' liberty interests in violation of *their* due process rights under the Fourteenth Amendment. However, there is no basis to find that the students' due process rights should be examined any differently than those of their parents, and this claim must fail as well.

## IV.

Plaintiffs allege that Defendants' Program violates the privacy guarantees of the United States Constitution by requiring students to reveal to the school and fellow students where the students perform charitable service and their reaction to such service. As discussed below, Plaintiffs' argument in this regard must be rejected.

■ "The cases sometimes characterized as protecting 'privacy' have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 598–600, 97 S.Ct. 869, 875–77, 51 L.Ed.2d 64 (1977) (footnotes omitted);

*see Hodge v. Jones*, 31 F.3d 157, 163–67 (4th Cir.) (records concerning suspected child abuse investigations kept after parents cleared of charges not protected), *cert. denied*, ―― U.S. ――, 115 S.Ct. 581, 130 L.Ed.2d 496 (1994); *Walls v. City of Petersburg*, 895 F.2d 188, 192 (4th Cir.1990) (questions regarding homosexual sex, family information and arrests not protected; financial information protected); *Taylor v. Best*, 746 F.2d 220, 225 (4th Cir.1984) (prisoner's privacy interest in family history outweighed by compelling public interest), *cert. denied*, 474 U.S. 982, 106 S.Ct. 388, 88 L.Ed.2d 340 (1985); *see also Vernonia Sch. Dist. 47J v. Acton*, ―― U.S. ――, 115 S.Ct. 2386, 132 L.Ed.2d 564 (June 23, 1995) (random urinalysis requirement for student athletes held valid under Fourth and Fourteenth Amendments). Plaintiffs allege that both of these interests are violated by Defendants' requirement that students disclose their service activities.

■ "Personal, private information in which an individual has a reasonable expectation of confidentiality is protected by one's constitutional right to privacy." *Walls*, 895 F.2d at 192. Therefore, as the first step in determining whether the information sought by Defendants' Program is entitled to privacy protection, the court must examine whether the information is within the students' "reasonable expectations of confidentiality." *Id.* "The more intimate or personal the information, the more justified is the expectation that [the information] will not be subject to public scrutiny." *Id.* (citing *Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105, 112–13 (3d Cir. 1987)).

In *Walls*, the Fourth Circuit examined a background questionnaire given to employees of a city's alternative sentencing program. 895 F.2d at 189–95. There, an employee terminated because she refused to complete the questionnaire brought suit against the city arguing that certain questions violated her constitutional right to privacy. *Id.* at 191–95. The court held that, under *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), a question regarding homosexual sex did not ask for information the

plaintiff had a right to keep private. The court also held that questions regarding information that is freely available in public records do not implicate the right of privacy because there can be no reasonable expectation of privacy in such information. The court held, however, that financial information, such as outstanding debts, is protected by the right to privacy. *Walls*, 895 F.2d at 194 (citing *Fraternal Order of Police*, 812 F.2d at 115; *Barry v. City of New York*, 712 F.2d 1554, 1559 (2d Cir.), *cert. denied*, 464 U.S. 1017, 104 S.Ct. 548, 78 L.Ed.2d 723 (1983)).

Plaintiffs argue that a student's particular choice of organizations to assist reveals the student's "concept of good" and reflects the underlying moral and political value-judgment of that student. Plaintiffs assert that some students will be compelled by their conscience to provide service to controversial or unpopular organizations, political causes,[6] or religious organizations. Plaintiffs contend that a student working for, or seeking approval for work done for, such organizations must reveal to the school and fellow students the social, political, or religious beliefs of the student, and therefore reveal information that is protected by the right of privacy just as financial information was protected in *Walls, supra.*

■■■ The information Plaintiffs seek to include within the right of privacy comes within none of the areas recognized as within a "zone of privacy" by the Supreme Court, *see Paul v. Davis*, 424 U.S. 693, 712–13, 96 S.Ct. 1155, 1165–66, 47 L.Ed.2d 405 (1976) (citations omitted), or any other court. Moreover, a student's choice of or reaction to a school assignment is not within a student's "reasonable expectation of confidentiality." As school assignments, students may be asked to complete research and write about their favorite president, an interesting country, a particular book, current events, or political figures. They may be asked to write poetry, give a speech about a chosen topic, or write an essay on the judicial system. All of these assignments may reveal something about the student besides the stu-

dent's grasp of grammar. A student may very well feel compelled by his or her conscience to praise the best known president of a particular political party, applaud the actions of a country considered hostile to the United States, complete a negative review of a religious book, criticize a particular group receiving recent publicity, or praise or denounce current political figures. However, a student does not have a reasonable expectation that such a choice or reaction is confidential. The current American scholastic experience is one in which students learn not only from books, but from each other as well.

■■■ Like the assignments discussed above, a student's choice of service projects and his or her written reaction to chosen projects may reveal something about the student. However, no more is revealed in such selection and writing than in more traditional school assignments. A student's choice of projects and reaction to those projects does not reveal such intimate or personal information that would give rise to a reasonable expectation of privacy. *See Walls*, 895 F.2d at 192. Therefore, Plaintiffs' arguments based on an alleged violation of their right of privacy in avoiding disclosure of personal matters are unavailing.

Plaintiffs argue that the Program conflicts with a second type of interest protected by the right of privacy. The right of privacy has been held to protect "independence in making certain kinds of important decisions." *Whalen*, 429 U.S. at 599–600, 97 S.Ct. at 876 (footnote omitted). "Important decisions" held protected by the right of privacy include decisions regarding, *e.g.*, abortion, *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), contraception, *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), inter-racial marriage, *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), and parents' ability to choose a private rather than a public school, *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), *cited in Whalen*, 429 U.S. at 600 n. 26, 97 S.Ct. at 876 n. 26. Plaintiffs assert that the Pro-

---

6. Plaintiffs allege that, although Defendants' Program does not allow students to work for politi-

cal parties or candidates, many of the approved organizations have political agendas and goals.

gram's disclosure requirement will cause students to choose "safe" service projects in order to avoid possible embarrassment and controversy. Plaintiffs contend that such a situation infringes upon their independence in "making an important decision"—choosing service projects.

■■■■ The right of privacy has been held to protect only significant, personal decisions. The situation Plaintiffs seek to include within the right of privacy does not fall within the sphere of such decisions. The selection of one of many possible service organizations to work with for program credit, even if that selection is influenced by a fear of possible reputational damage as a result of the Program's described disclosure requirements, is not a decision protected by the right of privacy.

■■■■ Plaintiffs also argue that the Program "chills" students' exercise of constitutional rights by requiring students to disclose the name of their chosen service project. The Supreme Court "consistently has refused to allow government to chill the exercise of constitutional rights by requiring disclosure of protected, but sometimes unpopular, activities." *Thornburgh v. American College of Obstetricians & Gynecologists,* 476 U.S. 747, 767, 106 S.Ct. 2169, 2182, 90 L.Ed.2d 779 (1986) (citing *Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965); *Talley v. California,* 362 U.S. 60, 64–65, 80 S.Ct. 536, 538–39, 4 L.Ed.2d 559 (1960); *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 462–65, 78 S.Ct. 1163, 1171–73, 2 L.Ed.2d 1488 (1958)). In *American College of Obstetricians & Gynecologists,* the Court invalidated an abortion-reporting statute that "pose[d] an unacceptable danger of deterring the exercise of" the right to choose to have an abortion. 476 U.S. at 767–68, 106 S.Ct. at 2182–83. The Court reasoned that the statute's "reporting re-

quirements raise the specter of public exposure and harassment of women who choose to exercise their personal, intensely private, right, with their physician, to end a pregnancy." *Id.* at 767, 106 S.Ct. at 2182. In the case at bar, students' exercise of constitutional rights are not "chilled" by the Program's disclosure requirements. Students are not required to report *all* of their service work. Nor are students prohibited from working for non-approved organizations without credit. Students are required to report only fifty hours of service work over a period of four years. Students are otherwise free to choose and work for controversial or unpopular service projects without seeking credit from, and disclosing their choice to, the school or other students.[7]

### V.

The court's holding is a narrow one based on the specific facts of this case. As the Supreme Court has recognized, a child is not a "mere creature of the State." *Pierce,* 268 U.S. at 535, 45 S.Ct. at 573. Parents are rightly concerned about encroachments by the State into areas traditionally considered reserved to them. Ordinarily, however, it is not up to the federal courts to determine who should teach, what to teach, and how it should be taught. The Chapel Hill–Carrboro City Board of Education is made up of duly-elected officials who have discretion in establishing a curriculum for Chapel Hill High School. Plaintiffs retain the right to seek change by supporting, along with their neighbors, school board candidates who would cancel or revise the community service program.

Summary judgment will be granted for Defendants on all of Plaintiffs' claims.

An order and judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

---

7. Although Plaintiffs have not alleged any of their claims as First Amendment claims, the Herndon family states that their objection to disclosing activities for which Aric Herndon seeks project credit is based on, among other things, their Christian faith. However, there are no allegations and no evidence in the record that the Herndon family considers their belief concerning charitable activities to be a "central religious belief or practice." *See Hernandez v. Commissioner,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148, 104 L.Ed.2d 766 (1989). Therefore, based on the evidence before the court and the right-of-privacy analysis discussed *supra,* the information Defendants require of the plaintiff Herndon family is not information protected by the right of privacy.

*ORDER AND JUDGMENT*

For the reasons set forth in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED that Plaintiffs' motion for summary judgment be, and the same hereby is, **DENIED.**

IT IS FURTHER ORDERED AND ADJUDGED that Defendants' motion for summary judgment be, and the same hereby is, **GRANTED** and this action is **DISMISSED** with prejudice.

### APPENDIX

March 1994

**Volunteer Opportunities
Currently on File**

(Come by Room A212 for more information and new listings added weekly)

*ANIMAL SERVICES*

Animal Protection Society
Orange County Animal Control

*ARTS/LITERATURE*

Ackland Art Museum
The Arts Center
Chapel Hill Arts & Music in Progress
N.C. Writer's Network
Orange County 4-H

*CHILDREN/YOUTH SERVICES*

Carolina Friends School
Carrboro Elementary After-School Program
Chapel Hill/Carrboro Head Start
Child Care Networks
Day Care Services
Ephesus Elementary After-School Program
Estes Hills Elementary After-School Program
FPG Elementary After-School Program
Glenwood Elementary After-School Program
Hargraves Recreation Center
Orange County 4-H Program
Orange-Durham Coalition for Battered Women
Seawell Elementary After-School Program
Street Scene Teen Center
Volunteers for Youth

*COMMUNITY DEVELOPMENT & PLANNING*

Chapel Hill Bicentennial
Chapel Hill-Carrboro Chamber of Commerce
Chapel Hill Downtown Commission/Volunteer Center
Chapel Hill/Orange County Visitors Bureau
Visitor's Center-Orange County

*CRISIS, COUNSELING & SUPPORT SERVICES*

Dispute Settlement Center
Orange County Rape Crisis Center
Orange Durham Coalition for Battered Women
Triangle Hospice
The Women's Center

*EDUCATION*

Chapel Hill-Carrboro Head Start Program
Center for Peace Education
Ephesus Elementary Science Lab
N.C. Health Careers Access Program
Orange County 4-H Club
UNC International Center

*ENVIRONMENTAL HEALTH*

Love Your Mother
New Hope Improvement Assoc./Streamwatch
Orange Community Recycling Program
SEAC

*HEALTH SERVICES*

American Cancer Society
American Heart Association
Group B Strep Association
Lineberger Comprehensive Cancer Center
Orange Cardiovascular Foundation
Ronald McDonald House
Triangle Hospice
UNC Hospitals
VA Medical Center

*MENTAL HEALTH*

Orange County Special Olympics
Residential Services, Inc.

*MISCELLANEOUS*

Center for Peace Education
UNC International Center

*OUTDOOR WORK/LANDSCAPING*

Carrboro Civic Club
Duke Gardens
Ephesus Elementary School

Habitat for Humanity
Orange County 4–H

*PUBLIC/SOCIAL SERVICES*
Carrboro Police Department
Chapel Hill Department of Housing
Chapel Hill Public Library
Habitat for Humanity
Interfaith Council for Social Services
Orange County Public Library
PTA Thrift Shop
UNC Public TV

*RECREATIONAL ACTIVITIES/COMMU-
NITY CENTERS*
Carrboro Parks & Recreation Department
Chapel Hill Community Center
Chapel Hill Department of Housing
Orange County 4–H
Orange County Special Olympics
Rainbow Soccer, Ltd.

*SENIOR CITIZENS*
Carol Woods Health Center
Chapel House
Hillhaven Rehabilitative and Health Care
Center
Senior Times (O.C. Dept. on Aging)
Willow Springs Rest Home