Aric HERNDON, a minor, by Christiana and John HERNDON, as Guardians; Christiana Herndon, as Guardian of Aric Herndon, a minor, and in her own right; John Herndon, as Guardian of Aric Herndon, a minor, and in his own right; John Reinhard, III, a minor, by John and Ellen Reinhard, as Guardians; John Reinhard, as Guardian of John Reinhard III, a minor, and in his own right; Ellen Reinhard, as Guardian of John Reinhard III, a minor, and in her own right, Plaintiffs–Appellants,

v.

CHAPEL HILL–CARRBORO CITY BOARD OF EDUCATION; Ken Touw, in his official capacity as member of the Chapel Hill–Carrboro City Board of Education; Sue Baker, in her official capacity as member of the Chapel Hill–Carrboro City Board of Education; Lavonda Burnette, in her official capacity as member of the Chapel Hill–Carrboro City Board of Education; Mary Bushnell, in her official capacity as member of the Chapel Hill–Carrboro City Board of Education; Judith Ortiz, in her official capacity as member of the Chapel Hill–Carrboro City Board of Education; Ruth Royster, in her official capacity as member of the Chapel Hill–Carrboro City Board of Education; Neil G. Pedersen, in his official capacity as Superintendent of Chapel Hill–Carrboro City Schools, Defendants–Appellees.

Kate Breen; Amy Cloud; Amy Rouse; American Alliance for Rights and Responsibilities; North Carolina School Boards Association, Amici Curiae.

No. 95–2525.

United States Court of Appeals, Fourth Circuit.

Argued March 5, 1996.

Decided July 11, 1996.

---

**ARGUED:** Scott Glenn Bullock, Institute for Justice, Washington, DC, for Appellants. John Gregory McCormick, John G. McCormick, P.A., Chapel Hill, North Carolina, Dennis Daniel Hirsch, Sidley & Austin, Washington, DC, for Appellees. **ON BRIEF:** William H. Mellor, III, Clint D. Bolick, Institute for Justice, Washington, DC, for Appellants. Eric W. Hinson, John G. McCormick, P.A., Chapel Hill, North Carolina; Rex E. Lee, Joseph R. Guerra, Mi-

chael J. Raphael, Sidley & Austin, Washington, DC; for Appellees. Richard Schwartz, Schwartz & Associates, Raleigh, North Carolina, for Amici Curiae Breen, Cloud, Rouse, and American Alliance. Ann L. Majestic, Ruth T. Dowling, Kathleen C. Boyd, Tharrington Smith, Raleigh, North Carolina, for Amicus Curiae School Boards Association.

Before ERVIN and NIEMEYER, Circuit Judges, and BUTZNER, Senior Circuit Judge.

Affirmed by published opinion. Judge ERVIN wrote the opinion, in which Judge NIEMEYER and Senior Judge BUTZNER joined.

## OPINION

ERVIN, Circuit Judge.

The Chapel Hill–Carrboro City Schools require as a condition of graduation that high school students perform fifty hours of community service. Two students and their parents sued the Chapel Hill–Carrboro City Board of Education, the individual board members, and the system superintendent (collectively "the district"). The plaintiffs charged that the community-service requirement violates the students' constitutional rights to freedom from involuntary servitude, personal liberty, and privacy; and the parents' constitutional right to direct the upbringing and education of their children. They sought a declaratory judgment and an injunction prohibiting implementation of the requirement. The district court entered summary judgment in favor of the district, finding that the requirement does not violate the plaintiffs' constitutional rights. We agree, and therefore affirm.

### I.

■ Subject matter jurisdiction in the district court was proper under 28 U.S.C. §§ 2201, 2202, and 1331. We have appellate jurisdiction over the district court's summary judgment under 28 U.S.C. § 1291. We review the summary judgment *de novo. E.g., Goodman v. RTC,* 7 F.3d 1123, 1126 (4th Cir.1993).

### II.

The facts are not in dispute, so we adopt the statement from the district court's opinion:

Defendant Chapel Hill–Carrboro City Board of Education is a governmental agency and body corporate organized under the education code of North Carolina, N.C. Gen. Stat. § 115C–40. Its members are charged with administering the Chapel Hill–Carrboro City School System. The system's high school, Chapel Hill High School, is located in Chapel Hill, North Carolina, and had a 1994–95 enrollment of 2,061 students in grades nine through twelve. Defendants Ken Touw, Sue Baker, Lavonda Burnette, Mary Bushnell, Judith Ortiz, Mark Royster, and Ruth Royster were, at the time this action was filed, individuals holding elective office as members of the Chapel Hill–Carrboro City Board of Education and each is sued in his or her official capacity.

At the time this action was filed, Defendant Neil G. Pedersen was superintendent of the Chapel Hill–Carrboro City Schools and an agent and employee of Defendant Board of Education. Defendant Pedersen is sued in his official capacity.

Beginning with the graduating class of 1997, students enrolled in the Chapel Hill–Carrboro School System are required to complete fifty (50) hours of community service during grades nine through twelve as a condition to receiving a diploma.[1] Failure to complete the Program makes a student ineligible for graduation and the Program does not contain an opt-out provision for students who object to performing community service. The community service required by the Program must be performed after school, on weekends or holidays, or over summer recesses. Students are required to perform a minimum of two different types of service. Clerical work is limited to no more than eight (8) hours, as are fundraising activities. The community service coordinator at Chapel Hill High School keeps on file a list of approved agencies and organizations for whom students may work to satisfy the requirements of the Program. The list of

organizations for which students may work is extensive and includes many with significantly different purposes and philosophies.

1 The hour requirements for students who transfer in to the Chapel Hill–Carrboro School System after the ninth grade are prorated.

Students may also receive credit for service performed for organizations which are not included on the list of approved organizations. However, in order for a student to receive credit for service performed for an organization not included on the list, a student must receive approval from the Service Learning Committee, a group of teachers, students, and members of community organizations charged with administering the Program. Ultimately, however, the principal of the high school is the final decision-maker concerning community service credit.

Services for which students receive monetary compensation or which are required as a form of restitution cannot be used to satisfy the requirements of the Program. Credit may not be received for service to a for-profit organization unless the service provides a benefit to the clients of such organization that they otherwise would not receive. Service provided to a group such as a church or student club, which primarily benefits the organization's members, will not be approved. Neither may activities that promote political parties or individual candidates be credited. Students must set their own work schedule and provide their own transportation to and from the location at which they perform community service. The organizations for which students perform their services are responsible for providing any training or necessary supervision. When students arrive to perform their service, students must sign in with the organization and a contact person with the organization must document the hours the student works. Students are required to turn verified time sheets in to the school. Each time a student performs service for an organization, he or she is thereafter required to reflect on any "memories or special feelings" gained from the particular service experience. After students complete the fifty (50) hours of required service, they must submit a one-to-two-page paper reflecting on their service experiences.

899 F.Supp. 1443, 1446–47 (1995) (citation to appendix omitted).

### III.

The plaintiffs do not appeal the district court's finding that the service requirement does not intrude on the students' right to privacy. We address individually the remaining constitutional issues.

### A.

■ The parents argue that the service requirement "violates parents' right to direct and control the upbringing and education of their children secured by the Fourteenth Amendment to the United States Constitution." That right is fundamental, they contend, so any infringement of it is subject to strict judicial scrutiny. Unless the district can demonstrate a compelling interest in implementing the service requirement, they assert, and can show that the requirement is narrowly tailored to advance that interest in the manner least restrictive of the parents' right, the requirement cannot survive strict scrutiny.

■ The parents' argument is controlled by the substantive due process branch of Fourteenth Amendment jurisprudence. Under that body of law, courts examine whether government intrusions into citizens' liberties are justified by adequate state interests. We apply a tiered framework of analysis, subjecting infringements on liberties deemed constitutionally "fundamental" to a heightened or "strict" level of judicial scrutiny, and examining encroachments on lesser rights under "the traditional standard of review, which requires only that the [challenged state action] be shown to bear some rational relationship to legitimate state purposes." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 37–40, 93 S.Ct. 1278, 1299–1300, 36 L.Ed.2d 16 (1973).

The Supreme Court long has recognized the existence of parents' right to direct their children's education. It first did so nearly seventy-five years ago in *Meyer v. Nebraska*,

in which a teacher appealed his conviction for teaching German in violation of state law. 262 U.S. 390, 396–97, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). "[W]ithin the liberty of the [Fourteenth] Amendment," the Court held, is a right of parents to seek German instruction for their children. *Id.* at 400, 43 S.Ct. at 627. Two years after *Meyer*, in *Pierce v. Society of Sisters*, the Court examined an Oregon statute requiring all children to attend public schools. 268 U.S. 510, 530, 45 S.Ct. 571, 572, 69 L.Ed. 1070 (1925). Citing *Meyer*, it invalidated the statute as "interfer[ing] with the liberty of parents and guardians to direct the upbringing and education of children under their control." *Id.* at 534–35, 45 S.Ct. at 573. After two more years, in *Farrington v. Tokushige*, the Court overturned a Hawaii restriction on foreign language schools, holding that "[t]he Japanese parent has the right to direct the education of his own child without unreasonable restrictions." 273 U.S. 284, 298, 47 S.Ct. 406, 408, 71 L.Ed. 646 (1927).

*Meyer, Pierce,* and *Tokushige* all use the language of rational relationship review. *Meyer,* 262 U.S. at 403, 43 S.Ct. at 628 ("We are constrained to conclude that the statute as applied is arbitrary, and without *reasonable relation* to any end within the competency of the state.") (emphasis added); *Pierce,* 268 U.S. at 534–35, 45 S.Ct. at 573–74 ("unreasonably interferes"); *Tokushige,* 273 U.S. at 298, 47 S.Ct. at 409 ("without unreasonable restrictions"). But all three were decided before the Court developed the current tiered framework—when it used only the "traditional" standard of scrutiny, *see Rodriguez,* 411 U.S. at 40, 93 S.Ct. at 1300—so they provide no dispositive guidance on which standard applies. Strict scrutiny of infringements on fundamental rights was first suggested in 1961. *See Poe v. Ullman,* 367 U.S. 497, 548, 81 S.Ct. 1752, 1779, 6 L.Ed.2d 989 (Harlan, J., dissenting) (1961) ("This enactment [a restriction on contraception] involves what, by common understanding throughout the English-speaking world, must be granted to be a most fundamental aspect of 'liberty,' the privacy of the home in its most basic sense, and it is this which requires that the statute be subjected to 'strict scrutiny.'" (citation omitted)). And it was not expressly embraced by a majority of the Court until 1971. *See Graham v. Richardson,* 403 U.S. 365, 375, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534 (1971).

The Court came close to deciding which standard protects parental rights in education in *Wisconsin v. Yoder,* in which it overturned convictions of Amish parents for removing their children from school before age sixteen. 406 U.S. 205, 207, 234, 92 S.Ct. 1526, 1529, 1542, 32 L.Ed.2d 15 (1972). Citing *Meyer* and *Pierce,* it reaffirmed that parental rights are among the liberties protected by the Constitution. *Id.* at 232–33, 92 S.Ct. at 1541–42. When those rights combine with First Amendment free exercise concerns, the Court held, they are fundamental: "[T]his case involves the fundamental interest of parents, as contrasted with that of the State, to guide the *religious* future and education of their children." *Id.* at 232, 92 S.Ct. at 1541 (emphasis added). Because religious concerns were central to the *Yoder* petitioners' position, the Court did not decide specifically whether the parental rights standing alone, in nonreligious contexts, are "fundamental" in the constitutional sense, or whether heightened scrutiny applies. But its opinion included dicta that are directly on point:

> [W]e must be careful to determine whether the Amish religious faith and their mode of life are, as they claim, inseparable and interdependent. A way of life, however virtuous and admirable, may not be interposed as a barrier to *reasonable* state regulation of education if it is based on purely secular considerations.

*Id.* at 215, 92 S.Ct. at 1533 (emphasis added).

Soon after *Yoder,* in *Runyon v. McCrary,* the Court addressed racial segregation in private schools. 427 U.S. 160, 163, 96 S.Ct. 2586, 2591, 49 L.Ed.2d 415 (1976). It held that the parental liberty recognized in *Meyer* and *Pierce* was not infringed upon by the prohibition of such segregation, because the law restricted admission policies rather than curriculum or choice of schools. *Id.* at 177, 96 S.Ct. at 2597. Thus it did not decide how closely to scrutinize restriction of that liber-

ty. Nevertheless, like *Yoder,* the *Runyon* opinion included instructive dicta:

> The Court has repeatedly stressed that while parents have a constitutional right to send their children to private schools and a constitutional right to select private schools that offer specialized instruction, they have no constitutional right to provide their children with private school education unfettered by *reasonable* government regulation. See *Wisconsin v. Yoder, supra,* at 213 [92 S.Ct. at 1532]; *Pierce v. Society of Sisters, supra,* at 534 [45 S.Ct. at 573]; *Meyer v. Nebraska,* 262 U.S., at 402 [43 S.Ct., at 627].

*Id.* at 178, 96 S.Ct. at 2597 (emphasis added); *accord Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 567 n. 4, 113 S.Ct. 2217, 2244 n. 4, 124 L.Ed.2d 472 (1993) (Souter, J., concurring in part and concurring in the judgment) ("Where parents make a 'free exercise claim,' ... the *Pierce* reasonableness test is inapplicable and the State's action must be measured by a stricter test, the test developed under the Free Exercise Clause....").

■ From *Meyer* to *Runyon,* the Supreme Court has stated consistently that parents have a liberty interest, protected by the Fourteenth Amendment, in directing their children's schooling. Except when the parents' interest includes a religious element, however, the Court has declared with equal consistency that *reasonable* regulation by the state is permissible even if it conflicts with that interest. That is the language of rational basis scrutiny. The claimants in this case concede that their interest is not religious, so we must reject their position if the service requirement "bear[s] some rational relationship to legitimate state purposes." *Rodriguez,* 411 U.S. at 40, 93 S.Ct. at 1300, 36 L.Ed.2d 16 (1973). The parents also acknowledge "the basic legitimacy" of the district's interest in teaching students the value of service, and that the service requirement is rationally related to that interest. Thus, under rational-basis scrutiny, the require-ment does not infringe unconstitutionally on their right to control their children's education.[1]

## B.

■ The students also advance a substantive due process argument, "that within the range of personal decisions protected by the Fourteenth Amendment must be the right to determine whether an individual wishes to provide charitable service to others." They acknowledge that there is no precedent for their argument, but claim that the right is rooted in "the long-established common law principle of refusing to transform what many would consider a moral duty (service to others) into a state-imposed obligation."

It is true that common law imposed no duty to serve others. But the absence of a common-law duty does not imply a constitutional prohibition against the imposition of such a duty. The Supreme Court has granted substantive due process protection only to rights that it deems particularly important. Those rights include liberties expressly protected by the Bill of Rights, *see Planned Parenthood v. Casey,* 505 U.S. 833, 847, 112 S.Ct. 2791, 2804, 120 L.Ed.2d 674 (1992), and others that are not specified in the Constitution but involve "personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education." *Id.* at 851, 112 S.Ct. at 2807 (citing *Carey v. Population Servs. Int'l,* 431 U.S. 678, 685, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977)).

Freedom from compulsory charitable service is not among the rights the Court has recognized, and the Court has expressed forcefully that we should expand the sphere of those rights only with great caution:

> The Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution.... There

---

1. The Second Circuit addressed this issue earlier this year in *Immediato v. Rye Neck Sch. Dist.,* 73 F.3d 454 (2d Cir.1996). Citing *Pierce, Meyer, Yoder,* and *Runyon,* among other cases, it agreed that parents' right to direct their children's edu-cation is subject only to rational-basis review, and that the educational purpose of a community service requirement easily satisfies that standard. *Id.* at 461–62.

should be, therefore, great reluctance to expand the substantive reach of these Clauses, particularly if it requires redefining the category of rights deemed to be fundamental. Otherwise, the Judiciary necessarily takes to itself further authority to govern the country without express constitutional authority. The claimed right pressed on us today falls far short of overcoming this resistance.

*Bowers v. Hardwick,* 478 U.S. 186, 194–95, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986). Justice O'Connor noted in *Casey* that the Court has expanded substantive due process beyond the Bill of Rights only to rights that "involv[e] the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy...." 505 U.S. at 851, 112 S.Ct. at 2807. The decision to serve one's community is important, but it is not so "intimate and personal" that it merits Fourteenth Amendment protection.[2]

### C.

■ Finally, the students argue that requiring them to perform community service violates the Thirteenth Amendment prohibition of involuntary servitude. They argue that while the chief aim of the amendment was to abolish slavery, "involuntary servitude" is a broader concept including, outside of well-established exceptions, any " 'control by which the personal service of one man is disposed of or coerced for another's benefit.' " Brief of Appellants at 28 (quoting *Bailey v. Alabama,* 219 U.S. 219, 240–41, 31 S.Ct. 145, 151, 55 L.Ed. 191 (1911)). The district court, following the Supreme Court's statement in *Lee v. Weisman* that the option not to participate in one's high school graduation is not a voluntary choice, determined that the required service is not voluntary. 899 F.Supp. 1443, 1448 (1995) (citing 505 U.S. 577, 594–95, 112 S.Ct. 2649, 2659–60, 120 L.Ed.2d 467 (1992) (holding that First

Amendment Establishment Clause prohibits school-sponsored prayer at public high school graduation ceremony)). It held, however, that the labor required by the service requirement is not sufficiently "akin to African slavery" to warrant prohibition under the Thirteenth Amendment. *Id.* at 1447–49 (quoting *Butler v. Perry,* 240 U.S. 328, 332, 36 S.Ct. 258, 259, 60 L.Ed. 672 (1916)). The students contend that the district court's opinion contradicts the plain meaning of the Thirteenth Amendment, because "involuntary servitude" is, simply, service that is not voluntary. To ignore the Amendment's plain meaning in favor of its "general spirit," they argue, is error. Brief of Appellants at 29 (quoting 899 F.Supp. at 1449).

We agree that the district court's reasoning was flawed, but we concur in its conclusion. The court's reliance on *Lee v. Weisman* was misplaced, for voluntariness under the Establishment Clause is not equivalent to voluntariness under the Thirteenth Amendment. The reach of the Establishment Clause extends beyond forced exposure to particular religious ideas to mere endorsement of them, *County of Allegheny v. ACLU,* 492 U.S. 573, 601, 109 S.Ct. 3086, 3105, 106 L.Ed.2d 472 (1989), or "excessive entanglement" with them, *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971). Thus the degree of involuntariness needed to invoke the Establishment Clause is exceedingly low, and includes the "subtle and indirect" pressure generated by school-sponsored, nonsectarian prayer. *See Weisman,* 505 U.S at 593, 112 S.Ct. at 2658. The *Weisman* Court itself acknowledged that its use of the word "voluntary" was distinguishable from the term's general definition: "[T]he fact that attendance at the graduation ceremonies is voluntary in a legal sense does not save the religious exercise." *Id.* at 596, 112 S.Ct. at 2660.

■ In the Thirteenth Amendment context, "subtle or indirect" pressure to work

---

**2.** The Second Circuit's *Immediato* decision addressed this issue, also:

> In light of the Supreme Court's recent admonition that we should be "reluctant to expand the concept of substantive due process," *Collins v. City of Harker Heights,* [503] U.S. [115, 125], 112 S.Ct. 1061, 1068 [117 L.Ed.2d 261] (1992), we decline plaintiffs' invitation to be the first

> court to [hold that the decision whether to serve others is a fundamental right]. Daniel's choice as to how to spend his free time, and whether or not he will perform any volunteer services, is not the stuff to which strict scrutiny is devoted.

*Immediato,* 73 F.3d at 463.

does not render that work involuntary. In *United States v. Kozminski,* in applying 18 U.S.C. § 241, the Supreme Court reviewed its previous Thirteenth Amendment decisions: "[O]ur precedents clearly define a Thirteenth Amendment prohibition of involuntary servitude enforced by the use or threatened use of physical or legal coercion." 487 U.S. 931, 944, 108 S.Ct. 2751, 2760, 101 L.Ed.2d 788 (1988). Section 241 criminalizes conspiracy against citizens' rights, and applies only to "rights *established* by the Federal Constitution or laws and by decisions interpreting them," so the Court cautioned that it did not intend its survey to limit conclusively "the potential scope of the Thirteenth Amendment." 487 U.S. at 941, 944, 108 S.Ct. at 2759, 2760–61 (emphasis added). But the Court previously had limited the scope of involuntary servitude, in *Butler, supra,* to "those forms of compulsory labor akin to African slavery which, in practical operation, would tend to produce like undesirable results." 240 U.S. at 332, 36 S.Ct. at 259.

Graduation from a public high school is an important opportunity, but the threat of not graduating does not rise to the level of "physical or legal coercion." *Kozminski,* 487 U.S. at 944, 108 S.Ct. at 2760. More importantly, the community service requirement is in no way comparable to the horrible injustice of human slavery. *See Butler,* 240 U.S. at 332, 36 S.Ct. at 259. Thus it does not violate the Thirteenth Amendment prohibition of involuntary servitude.[3]

### IV.

The district's community service requirement does not intrude on the students' freedom from involuntary servitude, their right to privacy, or their parents' right to direct their upbringing and education. Thus we affirm the district court's summary judgment.

*AFFIRMED.*

---

**3.** Two other circuits recently have addressed this question. Citing *Butler* and *Kozminski,* the Third Circuit held that a mandatory service requirement did not violate the Thirteenth Amendment because it was not "akin to African slavery":

There is no basis in fact or logic which would support analogizing a mandatory community service program in a public high school to slavery. The record amply supports the defendants' claim that the community service program is primarily designed for the students' own benefit and education, notwithstanding some incidental benefit to the recipients of the services. An educational requirement does not become involuntary servitude merely because one of the stated objectives of the Program is that the students will work "without receiving pay."

*Steirer v. Bethlehem Area Sch. Dist.,* 987 F.2d 989, 998, 1000 (3d Cir.), *cert. denied,* 510 U.S. 824, 114 S.Ct. 85, 126 L.Ed.2d 53 (1993). The Second Circuit agreed:

Because we conclude that the mandatory community service program is not, on the whole, "compulsory labor" which, "in practical operation" produces "undesirable results" analogous to slavery, *Kozminski,* 487 U.S. at 942, 108 S.Ct. at 2759, we hold that the District's mandatory community service program does not constitute impermissible involuntary servitude.

*Immediato,* 73 F.3d at 460.